UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

WONDER WILLIAMS,

                    Plaintiff,

        vs.

ANTHONY J. ANNUCCI, Acting
Commissioner, Department of Corrections
and Community Supervision; JAMES
O'GORMAN, Deputy Commissioner for
Correctional Facilities; JOHN COLVIN,
Superintendent of Five Points; MATTHEW
THOMS, Superintendent of Mid-State; and
DONALD VENETTOZZI, Director of
DOCCS Special Housing and Inmate
Disciplinary Program; JOHN or JANE DOES
1-5, members of the DOCCS SHMC at Five
Points; and JOHN or JANE DOES 6-10,
members of the DOCCS SHMC at Mid-State,

                    Defendants.

**FIRST AMENDED COMPLAINT**

**JURY TRIAL REQUESTED**

Case No. 9:20-cv-01417-BKS-TWD

---

        Plaintiff Wonder Williams ("Plaintiff" or "Mr. Williams"), by his counsel Sidley Austin

LLP, as and for this Complaint, alleges the following:

## INTRODUCTION

        1.      This is a civil rights action for declaratory relief, as well as compensatory and

punitive damages, under 42 U.S.C. § 1983 ("Section 1983") for violations of Mr. Williams's

rights to due process under the Fourteenth Amendment of the Constitution of the United States

and to be free from cruel and unusual punishment under the Eighth Amendment of the

Constitution of the United States.

2.      For nearly nine consecutive years, Mr. Williams was subjected to long-term, cumulative, and continuous punishment by being placed in solitary confinement[1] while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"). During this time, Mr. Williams was confined in extreme isolation in a concrete cell the size of a parking space for at least 23 hours per day.

3.      Mr. Williams was placed in solitary confinement directly upon entering DOCCS custody.  His placement in solitary confinement was recommended by S.B. Duncan and Superintendent Graham at Auburn, as they claimed to believe that his placement in general confinement of any correctional facility was an "extreme risk to staff, inmates and the general public as well as the safety, security, and good order of the facility."  Duncan and Graham cited the events in 2007 for which Mr. Williams was sentenced to prison as the basis for recommending his placement in solitary confinement.  Over the course of Mr. Williams' time in solitary confinement, Defendants failed to introduce any additional reasons for his continued confinement.  The "reviews" of his confinement consist of rubber-stamped recitations of the original reason for which he was placed in solitary confinement.

4.      It is well established that prolonged solitary confinement causes severe harm and has compounding negative effects, especially on the young, disabled, and mentally ill.

---

[1] Mr. Williams uses the term "solitary confinement" to refer to his confinement in the Special Housing Unit ("SHU") under administrative segregation status as well as his time in the step-down program.  The National Commission on Correctional Health Care ("NCCHC") similarly defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."  National Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation) (2019), available at http://www.ncchc.org/solitary-confinement.  This confinement has other names, including isolated confinement, extreme isolation, segregation, room restriction, and SHU, but, in all cases, the prisoner experiences the same harmful isolation and other deprivations.

Nevertheless, DOCCS subjects many New York State prisoners to prolonged solitary confinement.

5.      Mr. Williams's years of solitary confinement caused him to suffer lasting physical and emotional trauma, the effects of which continue to date.

6.      Through their policies and practices as well as other acts or omissions, each of the Defendants subjected Mr. Williams to solitary confinement for an unreasonable and unconstitutional length of time, in knowing disregard of the lack of justification for such confinement.  Defendants further failed to provide Mr. Williams with adequate due process regarding the review of his administrative punishments, instead effectively rubber-stamping them for roughly eight years.  And Defendants refused to take corrective action by placing Mr. Williams in a less restrictive environment.

## JURISDICTION AND VENUE

7.      The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, by virtue of claims under 42 U.S.C. §§ 1983 and 1988, as well as the Eighth and Fourteenth Amendments of the Constitution of the United States.  Moreover, the Court can order declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

8.      Venue is proper within this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events constituting Mr. Williams's claims have taken place within this district while he was imprisoned at Mid-State Correctional Facility.

## PARTIES

9.      Plaintiff WONDER WILLIAMS is a 38-year-old man, who at all relevant times was held in the custody of the New York State Department of Corrections and Community

Supervision.  Mr. Williams was, on the dates and times hereinafter mentioned, confined at

Sullivan Correctional Facility ("Sullivan") in Fallsburg, New York, Auburn Correctional Facility

("Auburn"), Five Points Correctional Facility ("Five Points"), and Mid-State Correctional

Facility ("Mid-State").  The allegations in this Complaint are based upon Mr. Williams's

personal knowledge, as well as upon information and belief.

## DEFENDANTS

10.     At all times relevant to Mr. Williams's causes of action, each Defendant named

herein was employed by, and acted under color of law of, the State of New York.

11.     Plaintiff asserts each and every allegation relating to "Defendants" individually as

each such Defendant included in such definition, and such pleading referring to such defined

Defendants is for convenience and economy only and the avoidance of repetition.

*i.     DOCCS Commissioner Defendants*

12.     ANTHONY ANNUCCI, as Acting Commissioner of DOCCS (since

approximately April 2013), is responsible for the overall management and operations of DOCCS,

including the care, custody, and control of all prisoners housed in DOCCS facilities.  The

DOCCS Commissioner has final policy-making and supervisory authority within DOCCS and is

personally involved in authorizing and maintaining the unconstitutional policies and customs

challenged by Mr. Williams.  ANNUCCI is responsible for the overall management and

operation of DOCCS, which includes oversight of correctional institutions and assuring

compliance with state and federal law.  His responsibilities include reviewing and approving the

transfer of prisoners to DOCCS Special Housing Units ("SHU"), including Administrative

Segregation ("Ad Seg") and the step-down program, under a Central Office placement.  Upon

information and belief, ANNUCCI approved Mr. Williams's continued solitary confinement for

a period of time relevant to this action.  He is being sued in his individual and official capacities.

13.    ANNUCCI is aware of the unconstitutional policies and practices used by

DOCCS to keep inmates in solitary confinement for lengthy periods of time.  As a defendant in

*Peoples, et al. v. Annucci, et al.*, No. 11 Civ. 2694 (S.D.N.Y. April 18, 2011), ANNUCCI is well

aware of claims filed by inmates subjected to lengthy periods of confinement in SHU and the

resulting unconstitutional risk of harm to inmates.  Despite his awareness of the unconstitutional

risk of harm to inmates, including Mr. Williams, ANNUCCI failed to remedy the

unconstitutional policies and practices that enabled the violations of Mr. Williams's rights.

14.    The DOCCS Deputy Commissioner for Correctional Facilities, JAMES

O'GORMAN, has and at relevant times had policy-making and supervisory authority within

DOCCS and was personally involved in authorizing and maintaining the unconstitutional

policies and customs challenged by Mr. Williams.  Upon information and belief, O'GORMAN

instituted policies that facilitated Mr. Williams's placement in Ad Seg, including  the lack of

meaningful review of his status in Ad Seg, resulting in his continuous, unjustified placement

therein.

15.    O'GORMAN was responsible for the overall management and operation of the

correctional institutions within DOCCS, including Mid-State.  At all relevant times, his

responsibilities included reviewing and approving the transfer and assignment of prisoners to

SHU, including Ad Seg and the step-down program.  By law, O'GORMAN was the final arbiter

of Mr. Williams's continued confinement in solitary confinement.  *See* 7 N.Y.C.R.R.

§ 301.4(d)(3).  Upon information and belief, O'GORMAN approved Mr. Williams's continued

confinement in solitary confinement, including administrative segregation and the step-down

program, for a period of time relevant to this action.  The approval included signing each review despite lacking any justification for continuing such detention, or allowing Mr. Williams' continued placement in solitary confinement without meaningful review, and occasionally without even a purported review, but nonetheless proceeding in knowing disregard of the facts. He is being sued in his individual and official capacities.

16.    Under DOCCS regulations, the DOCCS Deputy Commissioner has the authority to make determinations whether to retain the inmate in solitary confinement or to release them. *See* 7 N.Y.C.R.R. § 301.4(d)(3).  On information and belief, on at least one occasion since November 2017, O'GORMAN, as mandated by New York regulations, reviewed, approved, and signed off on the disciplinary review boards' continued decisions to keep Mr. Williams confined in solitary confinement, in knowing disregard of the lack of penological justification for such confinement.

17.    Furthermore, each of the DOCCS Commissioner Defendants has been on notice of the constitutional violations suffered by inmates, including Mr. Williams, who have been subjected to prolonged confinement in solitary confinement, including Ad Seg and the step-down program.  Not only do state regulations mandate their involvement in segregation reviews, but both of these DOCCS Commissioner Defendants have been named as defendants in similar challenges to the unconstitutional practices surrounding the confinement of inmates in Ad Seg.[2] The constitutional violations of the rights of inmates confined in solitary confinement, including

---

[2] *See, e.g.*, *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355 (N.D.N.Y. 2020) (asserting claims presenting triable issues of whether defendants, including O'Gorman, violated inmates due process and Eight Amendment rights by inmates prolonged solitary confinement); *Smith v. Annucci*, No. 6:18-cv-06261 EAW, 2019 WL 539935 (W.D.N.Y. Feb. 11, 2019) (same with respect to Annucci).

both Ad Seg and the step-down program, is well documented within and outside the legal

community,[3] putting the DOCCS Commissioner Defendants on notice of such violations.[4]

*ii.    DOCCS Superintendents*

18.    The DOCCS Superintendents are responsible for the care, custody, and safety of

all prisoners under their immediate jurisdiction.  In this role, the DOCCS Superintendents are

and at all relevant times were personally involved in the care, custody, and conditions of inmates

in solitary confinement, including Ad Seg and the step-down program.

19.    The DOCCS Superintendent at Five Points, JOHN COLVIN, and the DOCCS

Superintendent at Mid-State, MATTHEW THOMS, managed DOCCS facilities where Mr.

Williams was housed in SHU and had policy-making and supervisory authority with regard to all

operations.  Each DOCCS Superintendent managed or manages a DOCCS facility where Mr.

Williams was housed in the Special Housing Unit and had or has policy-making and supervisory

---

[3] *See, e.g.*, *Comment on the Proposed Regulations for Disciplinary and Administrative Segregation of Inmates in Special Housing*, NEW YORK CIVIL LIBERTIES UNION (Oct. 28, 2019), https://www.nyclu.org/en/publications/comment-proposed-regulations-disciplinary-and-administrative-segregation-inmates (noting the inadequacies of DOCCS' proposed changes to administrative segregation despite concerns over the "prevalent misuse of solitary confinement"), Erin Durkin, *NYCLU Report Finds Increase in Solitary Confinement in State Prisons*, POLITICO (Oct. 28, 2019), https://www.politico.com/states/new-york/albany/story/2019/10/28/nyclu-report-finds-increase-in-solitary-confinement-in-state-prisons-1226020; Jan Ransom, *Beaten and Left in Solitary Confinement, He Thought He Would Die*, N.Y. TIMES (Oct. 20, 2019), https://www.nytimes.com/2019/10/20/nyregion/rikers-inmates-solitary-lawsuit.html (discussing the increasing use of prolonged solitary confinement in New York prisons and noting the deleterious effects such confinement has on inmates); Joshua Manson, *Indefinite Solitary Confinement in New York is Finally Put to the Test*, THE APPEAL (June 3, 2019), https://theappeal.org/new-york-indefinite-solitary-confinement-is-finally-put-to-the-test/; William Blake, *Voices from Solitary: A Sentence Worse Than Death*, SOLITARY WATCH (Mar. 11, 2013), https://theappeal.org/new-york-indefinite-solitary-confinement-is-finally-put-to-the-test/.

[4] *Manning v. Griffin*, No. 15-CV-3 (KMK), 2016 WL 1274588, at *7 (S.D.N.Y. Mar. 31, 2016) (noting that "widespread recognition" of constitutional violations "render[ed] it plausible that Defendants . . . were aware that the Plaintiff belong[ed] to an identifiable group of prisoners" suffering deprivations of their constitutional rights).

authority over all operations at their facility.  The DOCCS Superintendents are and at all times

relevant were personally involved in the decision to confine inmates, including Mr. Williams, to

Ad Seg and SHU.[5]  Under DOCCS regulations, the Superintendent of each facility is required to

make an independent determination as to whether an inmate remains in solitary confinement or is

released from Ad Seg or the step-down program, and to review disciplinary hearings that impose

punishments to solitary confinement.[6]  Upon information and belief, THOMS and COLVIN

denied Mr. Williams his right to meaningful review of his Ad Seg status, approved the

disciplinary review boards' continued decisions to keep Mr. Williams in solitary confinement,

and failed to provide Mr. Williams with adequate living conditions during his time in Ad Seg

and the step-down program, in knowing disregard of the lack of justification for such

confinement.

20.    Each of the DOCCS Superintendent Defendants was directly responsible for the

treatment of Mr. Williams.  They decided the placement of inmates at Five Points and Mid-State

and, in knowing disregard of their lack of justification, signed off on the perfunctory Ad Seg

reviews described in detail below.  Each of the DOCCS Superintendent Defendants has been on

notice of the constitutional violations suffered by inmates, including Mr. Williams, who have

been subjected to prolonged solitary confinement.  In addition to state regulations mandating

their involvement in Ad Seg reviews, the unconstitutional deprivations occurring in DOCCS Ad

Seg are well-known.[7]  Furthermore, at least one of the Superintendent Defendants has been

---

[5] *See* 7 N.Y.C.R.R. § 300.2(a) (giving the Superintendent authority to designate certain areas of
the facility as Special Housing Units).
[6] *See id.* § 301.4(d)(2); *see also Bowens v. Smith*, No. 9:11–CV–784 (GLS/ATB), 2013 WL
103575, at *7 n.7 (N.D.N.Y. Jan. 8, 2013).
[7] *See supra* notes 2, 3.

named as a defendant in a similar challenge to unconstitutional conditions and practices associated with Ad Seg.[8]  Each is being sued in their individual and official capacities.

### iii.    DOCCS Special Housing Defendant

21.    The DOCCS Special Housing Unit Director has policy-making and supervisory authority with regard to SHU and to the DOCCS disciplinary process.  A DOCCS SHU Director's authority includes reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings.

22.    The SHU Director at all relevant times was DONALD VENETTOZZI, Director of DOCCS Special Housing and Inmate Disciplinary Program.  Upon information and belief, VENETTOZZI denied Mr. Williams meaningful review of his status in solitary confinement, including Ad Seg and the step-down program, on at least one occasion since November 2017 by reviewing, approving, and signing off on the disciplinary review boards' repeated decisions to keep Mr. Williams in solitary confinement.   He is being sued in his official and individual capacity.

### iv.    DOCCS SHMC Defendants

23.    DOCCS utilized a Discretionary Review Committee at each facility to determine whether a SHU prisoner should be granted a time-cut to his SHU sentence under the Superintendent's discretionary authority.  Upon information and belief, in April 2013, DOCCS replaced the DRC with the Special Housing Management Committee ("SHMC" or the "Committee") to be comprised of a Deputy Superintendent (to serve as a chairperson, lend guidance, and counsel staff), a SHU sergeant, a disciplinary lieutenant, and others designated by

---

[8] See, e.g., Zenon v. Downey, 2018 WL 6702851, at *2 (N.D.N.Y. Dec. 20, 2018) (naming Thoms in challenge to administrative segregation).

the Superintendent.  Upon information and belief, while the SHMC is required by DOCCS directives to make "recommendations" to the Superintendent, in practice it regularly exercised *de facto* power over time-cuts because Superintendents regularly rubber-stamped the determination without engaging in any independent analysis.  The SHMC Defendants include JOHN or JANE DOES 1-5, members of the DOCCS SHMC at Five Points during Mr. Williams's confinement to SHU at that facility and JOHN or JANE DOES 6–10, members of the DOCCS SHMC at Mid-State during Mr. Williams's confinement to SHU at that facility.

24.    Each of the Defendants named in this Complaint have been on notice of the constitutional violations suffered by inmates, including Mr. Williams, who have been subjected to prolonged solitary confinement. Not only do state regulations mandate their involvement in the continuing review of an inmates placement in solitary confinement, but the issues surrounding Ad Seg in DOCCS are well-known by both legal experts and the community.[9]

## STATEMENT OF FACTS

25.    Mr. Williams was held in solitary confinement by Defendants from March 6, 2010 until February 6, 2019.  He was 27 years old when he entered solitary confinement.  He is currently 38 years old.

### Early Life

26.    Mr. Williams is the child of two military parents.  His father joined the army in 1977 as a medic and was transferred to the air force in 1996.  Mr. Williams's father rose in the ranks to sergeant and completed a tour in Iraq in 2003 before retiring at the rank of major and accepting a position in the State Department.

---

[9] *See supra* note 3.

27.     Mr. Williams's mother also made her career in the military before retiring to civilian life.  She separated from Mr. Williams's father during Mr. Williams's childhood.

28.     Before Mr. Williams was incarcerated, he worked for the security division of a project management firm on government contracts.  In his youth, he worked part-time at restaurants to support himself after school.

29.     In December of 2020, Mr. Williams had a parole hearing at which time he stated his case for release.  A few weeks following his parole hearing, Mr. Williams was informed that he would be granted parole and would be released on January 19, 2021.

30.     In January of 2021, Mr. Williams was diagnosed with COVID-19 while incarcerated at Sullivan Correctional Facility.  Mr. Williams was required to complete a 14-day quarantine prior to his release.

31.     On February 23, 2021, Mr. Williams was released from Sullivan Correction Facility.  He currently resides in Wilmington, Delaware with his family.

<u>Initial Placement in Administrative Segregation</u>

32.     Prison officials have authority to punish prisoners who violate prison rules and regulations as well as prisoners who break the law while in prison.  Officials may place these prisoners into disciplinary segregation as punishment.  However, prisoners may only be placed into disciplinary segregation for a specified time period following a Tier III hearing wherein prison officials must provide the accused inmate with written notice of the charges including the specific date, time and place of the alleged misconduct as well as enough additional information for the inmate to prepare a defense.  Officials also have the authority to place prisoners into Ad Seg, in instances where officials determine that the prisoner threatens the safety and security of the prison.  Unlike disciplinary segregation, Ad Seg does not require the inmate be placed in a

special housing unit for a specified time period. Instead, the prisoner is placed into Ad Seg and his or her status is supposed to be periodically reviewed to determine if continued segregation is warranted. On March 6, 2010, Mr. Williams was committed to the care and custody of DOCCS at the age of 27 for two counts of Conspiracy in the 2nd degree, Assault in the 1st degree, and Criminal Possession of a Weapon in the 2nd degree, all stemming from his involvement in a shooting and murder-for-hire plot.

33.     Mr. Williams was immediately placed in Ad Seg upon entering DOCCS custody. His placement in Ad Seg was recommended by correctional staff, as they asserted that his placement in general confinement was an "extreme risk to staff, inmates and the general public as well as the safety, security, and good order of the facility." To justify his Ad Seg placement, correctional staff cited Mr. Williams's use of telephones, U.S. Mail, Western Union, and jail visits while he was incarcerated on Riker's Island in 2007 to coordinate a failed murder-for-hire plot.

34.     From March 6, 2010 to July 6, 2015, Mr. Williams was confined in Ad Seg at Auburn. From July 6, 2015 to December 1, 2017, Mr. Williams was confined in Ad Seg at Five Points.

35.     On December 1, 2017, Mr. Williams was transported from Five Points to Mid-State. Mr. Williams was confined in Mid-State's SHU from December 1, 2017 to February 6, 2019 and was not afforded any hearing or subsequent review of his segregated status.

<u>Placement in Step-Down Program</u>

36.     On December 1, 2017, Mr. Williams was formally placed into a step-down program.

37.    The step-down program was allegedly designed to provide a phased transition for individuals in Ad Seg to return to general population.  However, conditions in the step-down program were equally as restrictive as in Ad Seg and constituted continued solitary confinement, and Mr. Williams continued to be housed in the SHU while purportedly in the step-down program.

38.    On February 6, 2019, Mr. Williams was moved to general population.

39.    As a result of his many years in Ad Seg, as well as the additional year in the step-down program, Mr. Williams was in solitary confinement for a total of nine years.

<u>Conditions of Solitary Confinement</u>

40.    While in Ad Seg, Mr. Williams was kept under conditions of extreme isolation, sensory deprivation, and restricted movement.  Unlike the general population, he was denied all work, cultural, and social opportunities.  He had severely limited recreational opportunities, limited access to personal property, and limited contact with family and friends.

41.    Mr. Williams was housed in a single-occupancy concrete cell, roughly the size of a standard parking space, for at least 23 hours per day. He was transferred between cells at each facility, but the cells were always dirty, with dirty water sometimes coming out of the sinks. The water from the sinks in Mr. Williams' cell was frequently cold during his five years at Auburn. A bright light was kept on in or outside his cell at all hours of the day at every facility, and even though Mr. Williams complained to the officers that he could not sleep, personnel at the facilities refused to remedy the issue.

42.    Mr. Williams was allowed to shower two times per week while at Southport, and three times per week at Auburn, Five Points, and Mid-State, although the showers were often without hot water.  Sometimes the officers refused to take Mr. Williams to the showers even

when it was his allotted time.  The showers were typically visibly dirty and had not been sanitized between uses, and there was soap residue, dirt, and garbage left behind from prior users.  Mr. Williams developed skin rashes and fungal infections after using the showers.  In addition, his cell became cold starting in September each year, but the heat was not turned on until later in the year.  He was cold for weeks at a time every year in his cell, and he was not given adequate clothing to stay warm during the winter months.  Furthermore, there was no fresh air and no fan in the cells, so he was constantly overheating and uncomfortable in the summer months.

43.    Mr. Williams was only allowed one hour of outdoor recreation each day.  Outdoor recreation took place in a small, empty pen, which was enclosed on three sides by solid walls and with one side of mesh fencing.  The recreation pen had no equipment or structure to facilitate exercise.  Mr. Williams did not have access to group recreation nor the opportunity to interact with other people, even during these brief periods of recreation.  Furthermore, officers often refused to give Mr. Williams his allotted recreation time, sometimes for months at a time, and a reason was never given.

44.    While in Ad Seg, Mr. Williams was denied access to opportunities for group meals and group education.  He received all of his meals through a slot in his door and ate alone in his cell.  In addition, Mr. Williams was not permitted to attend therapeutic groups or programs for his mental health and behavioral needs.

45.    Mr. Williams was not permitted to interact with other prisoners and could not see any of the other prisoners.  The only way Mr. Williams could interact with the other prisoners was to yell from his cell.  However, prisoners risk disciplinary sanctions for yelling in their cells.  Despite this risk, many prisoners in the SHU did yell to communicate with one another.  The

constant yelling by the other prisoners never allowed Mr. Williams a moment of silence, and he typically found it hard to sleep.

46.     Mr. Williams had minimal human interaction in Ad Seg.  Typically, his only daily human interaction was with correctional officers or medical staff for a few minutes at a time. These interactions took place through a small open slot in his cell; no one came inside Mr. Williams's cell.  A counselor made rounds every day, but if Mr. Williams wanted to interact with the counselor, he had to yell out from his cell.  Mr. Williams was allowed to see visitors – without contact – once a week, but he was not allowed any phone calls at all.

<u>Conditions in the Step-Down Program</u>

47.     Mr. Williams was placed into a step-down program on December 1, 2017.  He remained in this program until he was finally released into general population on February 6, 2019.

48.     The step-down program was allegedly designed to provide a phased transition for individuals in Ad Seg to return to general population.  However, conditions in the step-down program were equally as restrictive as in Ad Seg and constituted continued solitary confinement.

49.     Although in name and on paper the step-down program would appear to be an improvement in conditions and a positive step towards the allowances and increased quality of life of general population, in reality the conditions are virtually identical to those of Ad Seg.  Mr. Williams continued to be housed in the SHU while in the step-down program.

50.     In the step-down program, as in Ad Seg, Mr. Williams was confined to his cell for 23 hours a day.  While Mr. Williams expected to receive an increase in allowances, he often was denied his one hour of recreation for months at a time.  Mr. Williams could not speak to or interact with other inmates.  He received only one visit per week and was not granted increased

privileges with regard to personal property and commissary purchases.  His recreation time was still spent alone in a small, concrete block.  The only minor difference between Ad Seg and the step-down program was that Mr. Williams received an additional four hours of inmate programming sessions each week.  However, Mr. Williams was still chained during the sessions.

51.     The lack of any meaningful difference between Ad Seg and the step-down program is made even more egregious by the fact that inmates do not receive any reviews of their status in step-down.  In Ad Seg, even though the reviews were not meaningful and often rubber-stamped copies of previous reviews, Defendants were required to conduct regular reviews of each inmate's continued placement in Ad Seg.  In the step-down program, solitary confinement is imposed with no requirement of reviews of any sort.

52.     Mr. Williams spent over a year in the step-down program without a meaningful review of his status, even though the conditions constituted continued solitary confinement.

### Medical and Mental Health Consequences of Solitary Confinement

53.     Mr. Williams has medical and mental health conditions as a result of or exacerbated by his nine years of solitary confinement.

54.     Even brief periods of solitary confinement can result in serious and debilitating physical consequences.[10]  Individuals held in solitary confinement for even a short period of time commonly experience sleep disturbances, headaches, lethargy, dizziness, heart palpitations, appetite loss, weight loss, severe digestive problems, diaphoresis (excessive sweating, as

---

[10] *See* Craig Haney's testimony and the Statement of the Physicians for Human Rights made and submitted to the Senate Judiciary Committee on the Constitution, Civil Rights and Human Rights Hearing on Solitary Confinement, June 19, 2012. Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, 112th Cong. 12–13 (2012), *available* at https://www.judiciary.senate.gov/imo/media/doc/12-6-19HaneyTestimony.pdf.

experienced by people in shock), back pain, joint pain, deterioration of eyesight, shaking, feeling

cold, and the aggravation of pre-existing medical conditions.[11]

55.     Mr. Williams has suffered several of these physical conditions as a result of his

extended time in solitary confinement, including sleep disturbances, migraines, weight loss due

to a thyroid condition, and back and neck pain.

56.     Mr. Williams began to suffer migraines and severe pain in his back and neck as a

result of his extended period in solitary confinement.  His migraines were very regular,

exacerbated by the constant light in the cell and the noise from other inmates, which prevented

sleep.

57.     Mr. Williams also developed a thyroid condition while in solitary confinement.

As a result, he lost a significant amount of weight over those nine years.  This condition was not

diagnosed until after he was released into general population, but the medical staff at Sullivan

told him that he had developed it while in solitary confinement.  He is now receiving treatment

for the condition, but he received no treatment – or even a diagnosis – while in solitary

confinement.

58.     Mr. Williams also suffers from back and neck pain as a result of his extended

period in solitary confinement.  The pain started when he slipped and fell in a shower in 2013

while at Auburn, and it got worse due to the uncomfortable, hard mattresses he was provided

with and lack of regular exercise.  Mr. Williams was prescribed muscle relaxers and received

physical therapy as treatment for the back and neck pain while at Auburn, but stopped receiving

those treatments in his subsequent facilities.

---

[11] *See* Physicians for Human Rights, Buried Alive: Solitary Confinement in the US Detention
System 1–2 (April 2013), available at https://phr.org/wp-content/uploads/2013/04/Solitary-
Confinement-April-2013-full.pdf.

59.     Mental health professionals have repeatedly and strongly cautioned against the use of solitary confinement in light of the serious, often irreversible, damage it causes.  Mr. Williams experienced many psychological conditions while in solitary confinement, including anxiety, depression, hopelessness, insomnia, and noticeable changes to his personality including increased introversion and difficulty focusing on daily tasks.

<u>Lack of Meaningful Review in Administrative Segregation<br>and the Step-Down Program</u>

60.     Mr. Williams was initially placed in solitary confinement in March 2010.  He remained in solitary confinement until February 6, 2019, nearly nine years.

61.     In accordance with 7 N.Y.C.R.R. § 301.4, DOCCS was required to conduct a review of Mr. Williams's Ad Seg status every thirty days.  Section 301.4 requires the Committee to review the prisoner's institutional record and write a report setting forth: "(i) reasons why the inmate was initially determined to be appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior and attitude; and (iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation."

62.     Although DOCCS purported to conduct official Ad Seg reviews, Mr. Williams never received any meaningful review of his Ad Seg status.

63.     Instead, the reviews contained substantially similar, sometimes even identical, language to prior reviews and used formulaic, boilerplate language that did not consider any changed circumstances since the previous review.  Despite Mr. Williams only having two minor disciplinary infractions on his record, one in October 2012 and one in January 2015, he was held in solitary confinement for nearly nine years without any indication from DOCCS of how he could behave differently to change his status.

64.    For example, from May 2010 to November 2017, Mr. Williams' reviews consisted of the same recitation of Mr. Williams' criminal history, his status as a gang member, and details of his crime of conviction.  Mr. Williams also did not receive any reviews during his time in the step-down program, from December 1, 2017 to February 5, 2019.

65.    The summary reports released by the facility three-member Committees (a subset of SHMC) which conducted Mr. Williams's reviews stated no other basis for retaining Mr. Williams in Ad Seg than the above-referenced details.  The Committee continued to recommend, without any articulable basis, that Mr. Williams's release into general population would pose an extreme risk to staff, inmates, and the safety, security, and order of the facility.  Despite the lack of any justification supporting such recommendations, all other Defendants continued the imposition of Ad Seg.

66.    Mr. Williams always submitted an inmate statement and appeal of each review, which was never meaningfully considered by Superintendents Colvin and Thoms, and was never referenced or meaningfully addressed by DOCCS in his next 60-day review.

67.    Mr. Williams's Ad Seg status did not change even during periods of time when his positive behavior was acknowledged by DOCCS.

68.    In his February 12, 2014 review, the Committee wrote: "Williams' current behavior is within acceptable and appropriate limits. . . While his behavior at this time is acceptable, it is the opinion of the three-member Committee that Williams continues to represent a risk if he were given the opportunity to return to general population."  Nonetheless, the Committee recommended that Mr. Williams remain in Ad Seg.

69.    In his October 10, 2014 review, the Committee wrote: "It should be noted that Williams has a clean disciplinary record."  Nonetheless, the Committee recommended that Mr. Williams remain in Ad Seg.

70.    Mr. Williams's September 8, 2015 review noted that "While in administrative segregation Williams has exhibited respectful behavior. . . . Williams has exhibited no noticeable behavioral changes within the last 60 days."  Despite this acknowledgement of Mr. Williams' good behavior, the Committee maintained that Mr. Williams had a "need for the higher level of supervision."

71.    In his September 15, 2016 Ad Seg review, the Committee mentioned that Mr. Williams had been at Five Points for over a year without any disciplinary issues, and that he was quiet and respectful with staff.  Even so, the Committee determined that he must remain in Ad Seg and impose the extraordinary condition of solitary confinement without any meaningful assessment of the relevant facts, including Mr. Williams's good behavior.

72.    In his July 20, 2017 Ad Seg review, the Committee reported that Mr. Williams had been at Five Points for over two years with no disciplinary issues, and made a note of his cooperation with staff.  In his August 22, 2017 Ad Seg review, the Committee again noted Mr. Williams's acceptable behavior and cooperation. In both of these instances, however, the Committee recommended Mr. Williams' continued confinement in Ad Seg, and the Superintendent chose to continue Mr. Williams's confinement without any meaningful consideration of the matter.

73.    The Committee's perfunctory approach to reviewing Mr. Williams's status is especially apparent in the practice of copying nearly verbatim comments from the previous review, even when the comments appear contradictory.  For example, in a September 15, 2016

20

review, the Committee wrote, "Inmate Williams has been at this facility for over a year without any disciplinary issues. Staff with direct contact indicate he is quiet and respectful. He maintains his cell. He is currently receiving two incentives for Administrative Segregation offenders." However, the Committee concluded without justification besides a recitation of his criminal conduct from 2007-2010, "The presence of Williams in general confinement of any correctional facility is an extreme risk to staff, inmates and the general public as well as the safety, security and good order of the facility."

74.    Mr. Williams received no reviews at all during his time in the step-down program from December 1, 2017 to on or about February 5, 2019, even though he was subject to conditions not materially different from those in Ad Seg.  Moreover, Mr. Williams' identification card on his cell door while he was in the step-down program read, "Admin Seg. No Bunkie."

75.    To reiterate, Mr. Williams never received meaningful reviews of his Ad Seg status.  Mr. Williams never received any reviews of his status in the step-down program, despite its nearly identical conditions to administrative segregation.  As a result he suffered in solitary confinement for nearly nine years.

Defendants' Acts and Omissions Caused Violations of Mr. Williams's Constitutional Rights

76.    The Defendants had the authority and indeed were required to conduct meaningful review of Mr. Williams's Ad Seg status.

77.    Defendants knew that being confined in solitary confinement would deprive Mr. Williams of basic life necessities, basic human dignity, and the right to be free from cruel and unusual punishment.

78.     Defendants were explicitly made aware, through administrative grievances and written complaints, that Mr. Williams was experiencing significant and lasting physical and mental injury as a result of his solitary confinement.

79.     Instead, and in the face of reports about his positive behavior, Defendants failed to provide Mr. Williams with meaningful reviews of his Ad Seg status and failed to transfer him from Ad Seg for nearly nine years.

80.     These failures deprived Mr. Williams of his constitutional rights to be free from cruel and unusual punishment and to receive due process in the form of meaningful and timely periodic reviews of his detention in Ad Seg and to be free from grossly disproportionate sentences.

81.     As a direct result of Defendants' actions, Mr. Williams suffered a deterioration of his physical and mental health, injuries that continue to harm him to date.

<u>Mr. Williams Has Exhausted All Administrative Remedies</u>

82.     On March 5, 2010, the Committee made their initial recommendation that Mr. Williams should be placed in Ad Seg.  Mr. Williams presented evidence at a hearing on March 10, 2010 regarding why he should not be designated to Ad Seg.  The Hearing Officer confirmed his placement in Ad Seg.

83.     Mr. Williams appealed the finding of his Ad Seg hearing via letter to the Deputy Commissioner of Correctional Facilities Central Office.  On April 30, 2010, the Central Office responded that it reviewed Mr. Williams' Ad Seg hearing and affirmed the finding that he should be placed into Ad Seg.

84.     On July 22, 2015, Mr. Williams submitted a grievance to the Inmate Grievance Resolution Committee ("IGRC") at Five Points based on wrongful confinement in the SHU

without a hearing or notice. On September 2, 2015, the IGRC denied Mr. Williams' grievance, stating only that Mr. Williams "has been in AD SEG since 2010. [T]his would account for the grievant now being housed in the SHU." On September 20, 2015, the Superintendent denied his appeal and wrote, "Your grievance issue was addressed except for your Ad Seg issue. As stated in the IGRC decision that matter can't be addressed through this forum. There is no substantiated evidence to support your appeal."

85.    On May 22, 2017, Mr. Williams submitted a grievance to Superintendent Colvin at Five Points regarding his lack of timely and meaningful reviews while held in Ad Seg. His grievance was denied by Defendant Colvin on June 16, 2017. Mr. Williams continued to submit appeals of his Ad Seg reviews to the Superintendent and Deputy Commissioner during his time in Ad Seg. He repeatedly noted that the Committee failed to state how long he would remain in Ad Seg, how he could behave differently in order to be considered for release, and that the Committee was simply repeating the same language from review to review.

86.    Subsequently, Mr. Williams submitted a variety of other grievances to the IGRC and the Superintendent at the facilities at which he was confined between 2013 and early 2019, when he was released from the step-down program, primarily regarding the conditions of his cell and his treatment while in Ad Seg. Most of these grievances were summarily denied by the Committee.

### Our Evolving Standards of Decency Demand Significant Limits on the Use of Prolonged Solitary Confinement

87.    Recognizing the severe and often irreversible harm caused by solitary confinement, a wide range of highly regarded professional groups and international organizations have publicly announced their commitment to sharply limiting or abolishing solitary confinement. Medical health professional associations, legal organizations, prisoner re-entry

organizations, correctional organizations, religious organizations, and international human rights bodies echo scientific research admonishing the use of solitary confinement.

88.    The American Psychiatric Association has stated that, with "rare exception," prisoners with mental illnesses should never be subjected to prolonged isolation, due to the real and serious potential for harm.[12]  The American Academy of Child and Adolescent Psychiatry similarly recognized "the potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis."[13]

89.    Notably, the National Commission on Correctional Health Care ("NCCHC") has declared that solitary confinement for longer than fifteen consecutive days is "cruel, inhumane and degrading treatment, and harmful to an individual's health," and advises that "[h]ealth care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided."[14]  In its Position Statement on Solitary Confinement, the NCCHC reports that "[t]hose in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs."[15]

90.    Professional legal organizations recommend serious restrictions on the use of solitary confinement.  The New York State Bar Association has stated that "solitary

---

[12] *See* American Psychiatric Association, *APA Position Statement on Segregation of Prisoners with Mental Illness* (2012), available at https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Psychiatric-Services-in-Adult-Correctional-Facilities.pdf.

[13] *See* Solitary Confinement of Juvenile Offenders (Approved by Council, Apr. 2012), available at https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y, 325, 325–83 (2006)).

[14] National Commission on Correctional Healthcare, *Solitary Confinement (Isolation)* (2016), available at https://www.ncchc.org/solitary-confinement.

[15] *Id.*

confinement, if used at all, should be measured in *days*, not years, months, or even weeks."[16] The American Bar Association has stated that only the most severe disciplinary offenses, in which safety and security are seriously threatened, ordinarily warrant a sanction that exceeds thirty days' placement in disciplinary housing.[17]

91.     International human rights bodies have condemned the use of solitary confinement and issued direct pleas to the United States to halt its continued use of the practice. The United Nations Special Rapporteur on Torture has concluded that fifteen days in solitary confinement is considered cruel, inhuman, or degrading treatment or punishment—in other words, torture.[18] The United Nations Committee Against Torture has expressed great concern over the frequent use of prolonged isolation and has recommended the United States "[l]imit the use of solitary confinement as a measure of last resort, for as short a time as possible[.]"[19]

92.     Religious leaders from diverse spiritual backgrounds are also united against the continued use of solitary confinement.[20]

---

[16] *See* N.Y. State B. Ass'n. Comm. On Civ. Rts. Report to the House of Delegates, *Solitary Confinement in New York* State, 1, 21 (Approved on Jan. 25, 2013) *available at* http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699 (emphasis in original).

[17] American Bar Association, Standards on Treatment of Prisoners (2011), available at https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.pdf.

[18] *See* Juan E. Mendez, Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011) *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf?OpenElement.

[19] *See* U.N. Comm. Against Torture, Concluding Observations on the Combined Third to Fifth Periodic Reports of United States of America (Dec. 19, 2014), available at https://digitallibrary.un.org/record/790513?ln=en#record-files-collapse-header.

[20] *See, e.g.*, Francis X. Rocca, National Catholic Reporter, Pope Francis Calls for Abolishing Death Penalty and Life Imprisonment (Oct. 23, 2014), available at https://www.ncronline.org/blogs/francis-chronicles/pope-francis-calls-abolishing-death-penalty-and-life-imprisonment; 220th General Assembly of the Presbyterian Church (USA), Commissioner's Resolution on Prolonged Solitary Confinement in U.S. Prisons (2012), available

93.     Nationwide, state and federal legislators have responded to the growing call to abolish the practice of solitary confinement.  The Senate Judiciary Subcommittee on the Constitution, Human Rights, and Civil Rights has held a series of congressional hearings to investigate the widespread use of solitary confinement and the attending harms.[21]

94.     Former President Barack Obama criticized the nation's widespread use of long-term solitary confinement, especially with respect to juveniles and those with mental illness, in light of the overwhelming evidence of the severe and long-term effects of solitary confinement. In order to increase the likelihood of successful re-entry, he announced that he would be adopting the recommendations of the Department of Justice as applied to the federal prison system, "banning the use of solitary confinement for juveniles and as a response to low-level infractions, expanding treatment for the mentally ill and increasing the amount of time prisoners in solitary can spend outside of their cells."[22]

95.     DOCCS has already acknowledged the harms caused by solitary confinement and agreed to limit its use of the practice in some contexts and for some populations.

96.     In the *Peoples v. Fischer* settlement, DOCCS acknowledged the harm SHU causes and agreed to systemic changes including providing progressive behavioral incentives for

---

at https://www.pc-biz.org/#/search/4389; The Rabbinical Assembly, Resolution on Prison Conditions and Prisoner Isolation (Passed by the Rabbinical Assembly Plenum May 2012), available at https://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation..

[21] *See* U.S. S. Judiciary Subcomm. on Const., Human Rights, & Civ. Rts., Hearing on "Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences" (June 19, 2012; Feb. 25, 2014), available at https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-the-human-rights-fiscal-and-public-safety-consequences and https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-ii-the-human-rights-fiscal-and-public-safety-consequences.

[22] *See* President Barack Obama, Opinion, Barack Obama: Why We Must Rethink Solitary Confinement, Wash. Post (Jan. 25, 2016).

prisoners in SHU, more beds in behavioral alternative units, and guidelines for Hearing Officers to consider when imposing SHU sanctions.[23]

97.    While a step in the right direction, the *Peoples* settlement is insufficient to remedy the severe harms endured by Mr. Williams and numerous others because there continues to be no limit to the accumulation of continuous SHU time.  The settlement also does not provide relief to prisoners like Mr. Williams that are placed in solitary confinement under Ad Seg status.[24]

## LEGAL CLAIMS

### I.    FIRST CAUSE OF ACTION (ALL DEFENDANTS)

#### Violations Of The Eighth Amendment For Imposing Cruel And Unusual Punishments That Contravene Standards Of Decency

98.    Mr. Williams repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

99.    At all relevant times, each of the Defendants acted under color of state law.

100.    Mr. Williams was at all times dependent on the Defendants to protect him from harm and to provide for his basic needs.

101.    The acts and omissions of the Defendants, which resulted in Mr. Williams's continuous solitary confinement for roughly nine years, contravene standards of decency against the use of long-term solitary confinement.

102.    By their use of the policies and practices described herein, the Defendants caused Mr. Williams to suffer severe harm by knowingly disregarding the substantial risk that being confined in solitary confinement would deprive Mr. Williams of life's necessities, basic human

---

[23] *See* Order Granting the Parties' Joint Motion for Final Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694, (S.D.N.Y. Apr. 1, 2016), ECF No. 331.
[24] *Id*. at 28 ("Nothing in this section precludes the continued selective use of Protective Custody or Administrative Segregation in accordance with established procedures.").

dignity, and right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

103.    The Defendants' actions have deprived Mr. Williams of basic human needs, such as normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.  Extremely prolonged deprivation of these basic human needs has inflicted permanent psychological injury on Mr. Williams.

104.    The risk of harm that Mr. Williams faced by being placed in solitary confinement was so obvious that knowledge may be inferred under these circumstances. It was patently obvious to the Defendants, and to any reasonable person, that the conditions imposed on Mr. Williams over many years would cause tremendous mental anguish, suffering, and pain.

105.    The Defendants' unconstitutional confinement of Mr. Williams and indifference to Mr. Williams's suffering constituted more than mere negligence because the Disciplinary Defendants were explicitly made aware, through administrative grievances and written complaints, that Mr. Williams was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement in Ad Seg.  As such, these circumstances fully support the conclusion that the Defendants had knowledge of the risk of harm that Mr. Williams faced in solitary confinement.

106.    The policies and practices complained of herein have been implemented by each of the Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

107.    Each of the Defendants is sued in their official capacities for declaratory relief and in their individual capacities for monetary damages, as they knowingly allowed the policies

and customs that permitted these Eighth Amendment violations to continue under their supervision and authority.

## II.    SECOND CAUSE OF ACTION (ALL DEFENDANTS)

<u>Violations of The Eighth Amendment For Imposing
Grossly Disproportionate Sentences To Solitary Confinement That
Serve No Legitimate Penological Purposes</u>

108.    Mr. Williams repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

109.    The Defendants' policy of indefinite and prolonged isolated confinement imposed disproportionate punishment on Mr. Williams.  The Defendants had no legitimate penological interest in retaining Mr. Williams in the debilitating conditions of Ad Seg solitary confinement.

110.    By their acts and omissions, the Defendants have subjected Mr. Williams to a confinement and infliction of significant psychological and physical harm over the course of nine years and have subjected him to the risk of future debilitating harm despite Mr. Williams's good behavior following his placement in Ad Seg.  This confinement serves no legitimate, penological purpose and is a grossly disproportionate punishment that violates Mr. Williams's Eighth Amendment right to be free from cruel and unusual punishment.

111.    Each of the Defendants is sued in their individual and official capacities for declaratory relief and in their individual capacities for monetary damages for subjecting Mr. Williams to grossly disproportionate terms of solitary confinement.

112.    Each of the Defendants is sued in their official capacities for declaratory relief and in their individual capacities for monetary relief, as they knowingly allowed the continuance of the policies and customs that permitted such violations of the Eighth Amendment to continue under their supervision and authority.

### III.    THIRD CAUSE OF ACTION (ALL DEFENDANTS)

Violations Of The Fourteenth Amendment Right To
Procedural Due Process For Lack of Meaningful Review

113.    Mr. Williams repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

114.    The Defendants have deprived Mr. Williams of a protected liberty interest in avoiding long-term solitary confinement.  The Defendants denied Mr. Williams both meaningful and timely periodic review of his detention in Ad Seg, as well as meaningful notice of what he must do to earn release, in violation of the Fourteenth Amendment.

115.    Because indefinite placement in Ad Seg constitutes a significant and uncommon hardship, Mr. Williams is entitled to meaningful notice of how he may alter his behavior to rejoin the general prison population or be placed in other less restrictive housing, as well as meaningful and timely periodic reviews to determine whether he still warrants detention in Ad Seg.

116.    The Defendants denied Mr. Williams any such notice or meaningful review by: (1) failing to provide Mr. Williams with notice of what he could do to get released from Ad Seg; (2) providing misleading notice that he could become eligible to be released from Ad Seg by maintaining "positive" behavior for a significant period, when in fact Mr. Williams had maintained positive behavior and was still housed in Ad Seg; (3) making a predetermination that Mr. Williams will stay in Ad Seg, thus rendering the periodic reviews procedurally meaningless; (4) failing to consider Mr. Williams's changes in behavior over time and whether he remained a security risk to justify his continuous confinement in Ad Seg; and (5) failing to conduct timely reviews and/or provide him with those reviews, thus precluding him from responding,

participating, or providing additional information and precluding the review Committee themselves from conducting meaningful review.

117.    The Defendants' actions are in violation of Mr. Williams's due process rights under the Fourteenth Amendment to the United States Constitution.

118.    Each of the Defendants are sued in their official capacities for declaratory relief, as each Defendant knowingly permitted policies and customs that violated the Fourteenth Amendment right to due process to continue.  The Defendants are also sued in their individual capacities for monetary relief for depriving Mr. Williams of his due process right to meaningful review.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff WONDER WILLIAMS respectfully asks that this Court:

1.    Declare that the Defendants' acts and omissions violated Mr. Williams's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution;

2.    Enter judgment in favor of Mr. Williams for reasonable actual and compensatory, including consequential, damages against each of the Defendants, jointly and severally, to compensate Mr. Williams for his pain, suffering, and other hardships arising from the Defendants' deliberate indifference to his medical needs and due process violations;

3.    Enter judgment for Mr. Williams for reasonable punitive damages against each of the Defendants;

4.    Award Mr. Williams the costs of this action, including reasonable attorneys' fees;

5.    Grant such other and further relief as this Court deems just and proper.

Dated: March 23, 2021
      New York, New York

Respectfully submitted,


By: /s/ James D. Arden
James D. Arden
Julia Bensur
Laura Sorice
SIDLEY AUSTIN LLP
787 Seventh Ave
New York, NY 10019
Telephone: (212) 839-5889
jarden@sidley.com
jbensur@sidley.com
lsorice@sidley.com

32