**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

WONDER WILLIAMS,

                                            Plaintiff,                      9:20-cv-1417 (BKS/TWD)

v.

JAMES O'GORMAN, JOHN COLVIN, MATTHEW
THOMS,

                                            Defendants.

**Appearances:**

*For Plaintiff:*
Ellen M. Dunn
Andrew A. Kunsak
Laura Sorice
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Leslie Kuhn-Thayer
Sidley Austin LLP
One S. Dearborn Street
Chicago, IL 60603

*For Defendants:*
Letitia James
Attorney General of the State of New York
Ryan W. Hickey
Assistant Attorney General
The Capitol
Albany, New York 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Wonder Williams, a former New York state inmate, brings this civil rights action under 42 U.S.C. § 1983, claiming that Defendants James O'Gorman, John Colvin, and Matthew Thoms violated his Eighth and Fourteenth Amendment rights while Plaintiff was incarcerated in the Special Housing Unit (SHU) of various New York Department of Corrections and Community Supervision (DOCCS) correctional facilities. (Dkt. No. 24). For more than seven and a half years of his incarceration, Plaintiff was placed in Administrative Segregation (Ad Seg), following which he entered a Step-Down to General Population Program (SDP) for over another year. (*Id.*). Defendants now move for summary judgment on all claims. (Dkt. No. 71). Plaintiff also moves for partial summary judgment on his procedural due process claims for the period between December 1, 2017, and February 6, 2019, against Defendants O'Gorman and Thoms. (Dkt. No. 72). The parties filed response briefs and Plaintiff filed a reply.[1] (Dkt. Nos. 75, 76, 81). The Court requested additional briefing on particular issues, (Dkt. No. 94), and both parties responded by letter brief, (Dkt. Nos. 95, 99). Additionally, Plaintiff filed a motion to strike portions of Defendants' affidavits. (Dkt. No. 77). Oral argument was held on May 10, 2024. (*See* Dkt. No. 94). For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part and Plaintiff's motion for partial summary judgment is denied. Plaintiff's motion to strike is denied as moot.

---

[1] Defendants did not file a reply brief.

2

## II.     FACTS[2]

### A.     Plaintiff's Incarceration

#### 1.     Placement in Ad Seg

Plaintiff entered DOCCS custody on January 8, 2010, to serve a sentence of 8 1/3 to 25 years on convictions for conspiracy, assault, and criminal possession of a weapon. (Dkt. No. 72-7, at 2). On March 5, 2010, "Sr. Inv. S.B. Duncan" issued an "Administrative Segregation Recommendation" for Plaintiff. (*Id.*). Sr. Inv. Duncan reported that on January 25, 2010, DOCCS had received a letter from the County of New York District Attorney "requesting that inmate Williams [sic] ability to communicate outside the prison setting be restricted due to public safety concerns." (*Id.*). As Sr. Inv. Duncan explained, Plaintiff was involved in a shooting on New Year's Eve 2007. (*Id.*). While Plaintiff was subsequently incarcerated on Rikers Island, he hired a hit man ("later identified as an undercover police officer") to kill three witnesses to the shooting. (*Id.*). He "executed this murder for hire plot" from jail "through telephone and jail visits" and "arranged, through the telephone and mail, to have family members" wire funds to the undercover officer. (*Id.*). When the plan was found out, he was charged with conspiracy, and "a New York County Supreme Court Justice issued a lockdown order restricting his communication privileges" in jail, which included "barr[ing] him from making telephone calls or receiving visits from anyone but his attorney." (*Id.*). While under these communication restrictions, Plaintiff "was able to convince a member of the jails [sic] Clergy to permit him to use his personal cell phone during religious services." (*Id.*). Sr. Inv. Duncan stated that "[d]ue to

---

[2] The facts are drawn from Defendants' Statement of Material Facts, (Dkt. No. 71-1), and Response to Statement of Material Facts, (Dkt. No. 75-1), as well as Plaintiff's Rule 56.1 Statement of Material Facts, (Dkt. No. 72-2), and Response to Defendants' Rule 56.1 Statement and Statement of Additional Material Facts in Dispute, (Dkt. No. 76-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in favor of the non-moving party on an issue. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

these factors the District Attorney's Office believes that Williams [sic] ability to communicate and have contact with outside person's [sic] poses a serious threat to the safety of those involved in his case." (*Id.*). Concluding that "[t]he presence of Williams in general confinement of any correctional facility is an extreme risk to staff, inmates and the general public as well as the safety, security and good order of the facility," Sr. Inv. Duncan "recommend[ed] [Plaintiff's] placement into Administrative Segregation." (*Id.*).

The same day as the recommendation was issued, Plaintiff was transferred to Auburn Correctional Facility, (*see* Dkt. No. 72-4, at 2), and placed into Ad Seg shortly thereafter, (*see* Dkt. No. 72-2, ¶ 14; Dkt. No. 75-1, ¶ 14; Dkt. No. 72-6, at 4, 5).[3] A hearing on Plaintiff's Ad Seg status began on March 10, 2010, and ended on March 15, 2010. (Dkt. No. 72-6, at 3, 4). On March 15, 2010, "DSS G. Richards" issued the following determination: "[i]n order to maintain the good order, safety, and security of this facility as well as the safety and security of the general public, inmates and employees of this facility you are to be placed in Admin. Seg. Status until you are no longer a threat to this facility or transferred to another facility." (*Id.* at 3; *see* Dkt. No. 72-2, ¶ 15; Dkt. No. 75-1, ¶ 15).

On February 27, 2015, Plaintiff was transferred to Southport Correctional Facility. (Dkt. No. 72-4, at 2). He was again transferred a few months later, arriving at Five Points Correctional Facility on July 6, 2015, and remaining there until December 1, 2017. (*Id.*). While at Southport and Five Points, Plaintiff remained in Ad Seg. (Dkt. No. 76-6, at 3; *see* Dkt. No. 71-1, ¶ 7; Dkt. No. 76-1, ¶ 7[4]).

---

[3] The parties disagree on the exact date Plaintiff began his confinement in Ad Seg. (*See* Dkt. No. 72-2, ¶ 14; Dkt. No. 75-1, ¶ 14). The recommendation for placing Plaintiff in Ad Seg is signed March 5, 2010, at 3:00 p.m. (Dkt. No. 72-6, at 5). A "Hearing Record Sheet" indicates that Plaintiff remained in Ad Seg prior to his hearing and the "serving date" and time is marked as March 6, 2010, at 8:17 a.m. (Dkt. No. 72-6, at 4). The exact date Plaintiff began his Ad Seg confinement is immaterial to the resolution of the pending motions.

[4] Paragraph numbers in Dkt. No. 76-1 correspond to those listed on pages 1–13.

According to Defendant Thoms, inmates in Ad Seg are allowed an hour of recreation per day. (Dkt. No. 76-11, at 12). Plaintiff testified that while in Ad Seg at Five Points, he was confined to a cell where he could not talk to other inmates. (Dkt. No. 76-6, at 17). His cell led to a "rec. pen" that was "no bigger than a parking space" with visibility through one side. (*Id.* at 9–10). Most of the cells "were dirty," and some were "filthy," and he did not receive certain requested cleaning supplies. (*Id.* at 11–13). During this period, Plaintiff filed a grievance stating that his "unfit and damaged mattress" prevented him from "get[ting] adequate or good sleep upon it" and "[i]t exacerbate[d] [his] back and neck pains . . . for months." (Dkt. No. 76-17, at 7).[5]

The record reflects Plaintiff received 45 Ad Seg reviews between March 2010 and December 2017. (*See* Dkt. No. 71-1, ¶ 35; Dkt. No. 71-3, at 5–79; Dkt. No. 76-1, ¶ 35; Dkt. No. 76-19, at 34).[6] Plaintiff's Ad Seg reviews were referred to the Central Office Committee. (Dkt.

---

[5] The Incarcerated Grievance Resolution Committee (IGRC) responded on February 6, 2018, that Plaintiff received a new mattress since the time his grievance was submitted. (Dkt. No. 76-17, at 6). Plaintiff appealed both to the Superintendent and to the Central Office Review Committee (CORC), stating to the latter that he did not receive a new mattress. (*See id.* at 6).

[6] Plaintiff and Defendants agree on the existence of "at least forty-four" Ad Seg reviews, (*see* Dkt. No. 71-1, ¶ 35; Dkt. No. 76-1, ¶ 35), and 45 reviews in total are contained in the record. Plaintiff's Ad Seg reviews occurred on the following dates: May 10, 2010 (Dkt. No. 71-3, at 5); July 2, 2010 (*id.* at 6); September 21, 2010 (*id.* at 7); November 16, 2010 (*id.* at 8); January 4, 2011 (*id.* at 9); March 8, 2011 (*id.* at 11); May 16, 2011 (*id.* at 11); June 15, 2011 (*id.* at 12); August 14, 2011 (*id.* at 14); October 25, 2011 (*id.* at 15); December 25, 2011 (*id.* at 16); February 23, 2012 (*id.* at 17); April 23, 2012 (*id.* at 18); June 22, 2012 (*id.* at 19); August 21, 2012 (*id.* at 20); October 20, 2012 (*id.* at 22); December 19, 2012 (*id.* at 23); February 17, 2013 (*id.* at 24); April 18, 2013 (*id.* at 25); June 17, 2013 (*id.* at 26); August 16, 2013 (*id.* at 27); October 15, 2013 (*id.* at 28); December 14, 2013 (*id.* at 30); February 12, 2014 (*id.* at 31); April 13, 2014 (*id.* at 33); June 12, 2014 (*id.* at 35); August 11, 2014 (*id.* at 36); October 10, 2014 (*id.* at 37); December 9, 2014 (*id.* at 38); February 7, 2015 (*id.* at 40); May 19, 2015 (*id.* at 42); July 15, 2015 (*id.* at 44); September 8, 2015 (*id.* at 46); November 12, 2015 (*id.* at 49); January 15, 2016 (*id.* at 52); March 16, 2016 (*id.* at 55); May 15, 2016 (*id.* at 58); July 16, 2016 (Dkt. No. 76-19, at 34); January 16, 2017 (Dkt. No. 71-3, at 61); March 15, 2017 (*id.* at 64); May 15, 2017 (*id.* at 67); July 15, 2017 (*id.* at 68); September 18, 2017 (*id.* at 71); October 17, 2017 (*id.* at 74); November 14, 2017 (*id.* at 77). The Court refers to the date of each review according to the "review date" provided in the top right-hand corner of each Ad Seg review form, unless otherwise noted, and excepting the March 8, 2011 and May 16, 2011 reviews. These two reviews do not have the "review date" filled in, and so are referred to by the date the three-person facility committee signed the reviews. (*See id.* at 10, 11). Additionally, the May 15, 2016 review states the review date year as 2010, but the dates in the rest of the review confirm that it took place in 2016. (*See id.* at 58–60).

No. 71-1, ¶ 10; *see* Dkt. No. 76-1, ¶ 10). Defendant O'Gorman signed 17 of Plaintiff's Ad Seg reviews from 2010 to 2017. (*See* Dkt. No. 71-1, ¶ 27; Dkt. No. 76-1, ¶ 27).[7]

Beginning with his November 12, 2015 Ad Seg review, Plaintiff objected ten times to the determinations to continue him in Ad Seg in follow-up statements. (*See* Dkt. No. 76-19, at 7–10, 16–18, 23–25, 30–32, 39–41, 46–47, 53–56, 60–61, 65–66, 67–69). Plaintiff also filed a grievance in May 2017 regarding the quality and timing of his Ad Seg reviews. (Dkt. No. 71-6, at 15; Dkt. No. 71-1, ¶¶ 29–30; *see* Dkt. No. 76-1, ¶¶ 29–30). Plaintiff appealed the grievance to both the Superintendent and the Central Office Review Committee. (Dkt. No. 71-6, at 12–14; Dkt. No. 71-1, ¶ 32; *see* Dkt. No. 76-1, ¶ 32).

Plaintiff's reviews all contained a description of the original reason Plaintiff was placed in Ad Seg. (*See* Dkt. No. 71-3, at 5–79; *see, e.g., id.* at 37 ("Williams . . . conspired to hire someone to murder civilian witnesses to stop them from testifying against him.")). The reviews frequently contained positive descriptions of Plaintiff's behavior and its aspects, characterizing it as "improved," (*e.g., id.* at 7, 9, 18, 30); "satisfactory" (*e.g., id.* at 8, 12, 14, 15, 23, 25, 26); "appropriate," (*e.g., id.* at 12, 14, 15, 32, 33, 37, 39, 43, 48, 70, 73, 79); and "acceptable," (*e.g., id.* at 5, 6, 32, 35, 40, 42, 72), among other descriptors. It was often mentioned that Plaintiff lacked disciplinary issues during the review period, (*e.g., id.* at 11, 12, 14, 15, 17, 18, 19, 21, 25, 33, 34, 36, 38, 44, 47, 50, 53, 56, 59, 63, 65, 69, 72, 75, 76, 78), and that he had earned

---

[7] Defendant O'Gorman signed the following of Plaintiff's Ad Seg reviews: July 2, 2010 (Dkt. No. 71-3, at 6; *see id.* at ¶ 20); September 21, 2010 (*id.* at 7; *see id.* at ¶ 20); November 16, 2010 (*id.* at 8; *see id.* at ¶ 20); January 4, 2011 (*id.* at 9; *see id.* at ¶ 20); March 8, 2011 (*id.* at 10; *see id.* at ¶ 20); May 16, 2011 (*id.* at 11; *see id.* at ¶ 20); June 15, 2011 (*id.* at 12; *see id.* at ¶ 20); October 25, 2011 (*id.* at 15; *see id.* at ¶ 20); December 25, 2011 (*id.* at 16; *see id.* at ¶ 20); June 22, 2012 (*id.* at 19; *see id.* at ¶ 20); February 17, 2013 (*id.* at 24; *see id.* at ¶ 20); December 9, 2014 (*id.* at 38; *see id.* at ¶ 20); March 15, 2017 (*id.* at 64; *see id.* at ¶ 20); July 15, 2017 (*id.* at 68; *see id.* at ¶ 20); September 18, 2017 (*id.* at 71; *see id.* at ¶ 20); October 17, 2017 (*id.* at 74; *see id.* at ¶ 20); November 14, 2017 (*id.* at 77; *see id.* at ¶ 20). The signatures for the March 15, 2017, September 18, 2017, October 17, 2017, and November 14, 2017 reviews are partially redacted. (See *id.* at 64, 71, 74, 77). However, O'Gorman's affidavit indicates that he did sign them. (*See id.* at ¶ 20).

incentives or privileges (*e.g.*, *id.* at 29 (noting Plaintiff "earned once a week television viewing with once a week commissary purchases"), 32, 34, 39, 51, 53, 59, 63, 65, 66).

The reviews also occasionally noted Plaintiff's anti-social or negative behavior. (*E.g.*, *id.* at 16 ("He has been disrespectful and belligerent at times, including during his Scheduled Transfer Review on 11/2/11 at which time he attempted to intimidate his counselor."), 17, 20, 51, 54, 60, 70). Additionally, Plaintiff's reviews indicate he was given two disciplinary sanctions: in October 2012, Plaintiff received a ticket "for smuggling food" (consuming candy outside the designated area for its consumption) and was sanctioned. (*Id.* at 22–23). In January 2015, a weapon—a sharpened toothbrush—was discovered in Plaintiff's cell during a cell frisk, (*see id.* at 40–41). As a result of the weapons infraction, he received a disciplinary sanction of 180 days in SHU. (*Id.* at 40).

Several of the reviews encouraged Plaintiff to "continue his good behavior" so as to receive "additional benefits" or "privileges." (*Id.* at 29, 43; *see also id.* at 34 (employing similar language), 48 (same)). His Central Office Committee review from April 2014 stated that Plaintiff "needs to demonstrate with continued positive adjustment that he is ready to be considered for a less restrictive confinement setting." (*Id.* at 34). In October 2017, the Central Office Committee stated that "his good behavior is noted and it is anticipated that at some point in the future that [sic] inmate Williams might be transitioned to a Step-Down Program and eventually possibly placed in a less secure setting." (*Id.* at 76). Excluding the final review he received, all his reviews ultimately ended with a decision to continue Plaintiff in Ad Seg and almost uniformly indicated the risk Plaintiff continued to pose if released into a less restrictive setting. (*See id.* at 5–76).

### 2.      Placement in SDP

On November 14, 2017, the Central Office Committee issued a report stating that it "feels that it may be appropriate to consider inmate Williams for a transition to a Step-Down program."

(*Id.* at 79). The Committee concluded that "placement in a specialized program will provide inmate Williams' [sic] the opportunity to continue his positive adjustment in a less restrictive environment while allowing the department to continue to monitor his behavior." (*Id.*). On November 30, 2017, Defendant O'Gorman, in his capacity of Acting Deputy Commissioner, (*see* Dkt. No. 72-22, at 10), signed Plaintiff's final Ad Seg review, checking a box labeled "[r]elease from administrative segregation," (*id.* at 77 (stating that "[f]ollowing a review of the Central Office Administrative Segregation Committee, [he] concur[red] with the Committee's recommendation regarding inmate William's [sic] release from Administrative Segregation"); *see also* Dkt. No. 71-1, ¶ 39; Dkt. No. 76-1, ¶ 39).

On December 1, 2017, Plaintiff was transferred from Five Points to Mid-State Correctional Facility. (Dkt. No. 72-4, at 2). Three days later, Plaintiff signed a form titled "Standards for the Step-Down to General Population Program." (Dkt. No. 76-7, at 2). Plaintiff testified that he did not recall being told "anything about . . . leaving the Ad. Seg." and entering SDP, instead he "was just transferred to Mid-State." (Dkt. No. 76-6, at 19–20). At Mid-State, Plaintiff lived in the SHU and participated in SDP. (*See id.* at 10; Dkt. No. 72-2, ¶ 16; Dkt. No. 75-1, ¶ 16). The goal of SDP is to return inmates who were in SHU to General Population upon completion of the program. (Dkt. No. 72-12, at 4; *see also* Dkt. No. 71-4, ¶ 29).[8]

Plaintiff testified that while in SDP, he remained in "SHU conditions," and did not receive a cellmate. (Dkt. No. 76-6, at 20, 27). The physical attributes of the cell were the same as at Five Points, (*id.* at 29), and the "rec. pen" was similar as well, (*id.* at 31). The program participants were not provided with congregate recreation and their recreation occurred at the

---

[8] Prior to entering SDP, Plaintiff had been in Ad Seg for more than seven and a half years. (*See* Dkt. No. 71-1, ¶ 7; Dkt. No. 76-1, ¶ 7).

rear of their cell. (Dkt. No. 72-12, at 4, 10). Plaintiff also testified that at times he "was denied rec." (Dkt. No. 76-6, at 30). Besides group sessions, there were no more opportunities to interact with other inmates, nor with officers, than at Five Points.  (*Id.* at 31, 32). He ate alone and took meals through the slot in the door. (*Id.* at 31).

Plaintiff grieved that the light was kept on hours a day for months and that he was fed inadequate amounts and types of food. (Dkt. No. 76-17, at 10, 21– 25).[9] Plaintiff also grieved that since he had been at Mid-State, Plaintiff was denied needed medical treatment for an unspecified medical condition and significant weight loss resulting from that condition. (*Id.* at 38–39). This condition and his weight loss led to a number of other symptoms, including "atrophy, lethargy, hand, finger and leg trembling, headaches, hair loss, sweating, irritability, trouble concentrating, trouble sleeping, anxiety, rapid, irregular pounding heartbeat, and more," which he also states were not treated. (*Id.* at 38). Plaintiff additionally grieved that he was experiencing "severe pain" as a result of being denied the same treatment he was previously prescribed. (*Id.* at 40).[10]

While in SDP, Plaintiff participated in and completed Aggression Replacement Training ("ART"), a type of group programming. (*See* Dkt. No. 72-9, at 4; Dkt. No. 76-6, at 22, 23). Plaintiff describes these group programming sessions as having occurred a few times a week, for no longer than an hour and a half. (Dkt. No. 76-6, at 23–24). During the sessions, the inmates had "separate desks" with "small gate[s]" to "partition" them. (*Id.* at 25). Additionally, Plaintiff

---

[9] Plaintiff's January 10, 2018 grievance regarding inadequate food service was accepted by both the IGRC and the Superintendent. (*See* Dkt. No. 76-17, at 19).

[10] At least one of Plaintiff's grievances regarding this issue was accepted by the IGRC and, "to the extent that it appears the grievant is being treated for his medical concerns," by the Superintendent. (Dkt. No. 76-17, at 37).

and the other inmates were "shackled to the desk[s]." (*Id.*). Counselors and social workers would primarily interact with Plaintiff during these group sessions. (*Id.* at 24–25).

Plaintiff did not receive periodic reviews in SDP such as those he previously received while in Ad Seg. (Dkt. No. 72-2, ¶ 22; *see* Dkt. No. 75-1, ¶ 22). The record reflects the existence of chronological entry sheets regarding Plaintiff's participation in SDP, (Dkt. No. 71-7*,* at 6–10), "informational reports" that documented Plaintiff's "positive," "negative," or "other behavior" during group sessions, (*id.* at 12–53), and "Program Management Team [("PMT")] Case Conference" notes, containing information on Plaintiff's progress, comments or concerns, and recommendations, (Dkt. No. 72-17, at 2–54). Defendant Thoms testified that while in SDP, inmates with disciplinary sanctions can receive "time cuts" (meaning reductions in their overall time spent in SHU), but individuals without disciplinary sanctions, like Plaintiff at this time, cannot receive cuts. (Dkt. No. 72-19, at 18–19).

Plaintiff grieved his placement in SHU and SDP on November 1, 2018, explaining that despite lacking SHU disciplinary time, he was being "held under SHU conditions."  (Dkt. No. 76-17*,* at 59). The IGRC denied his grievance "due to lack of cooperation, negative attitude/behavior and resistant [sic] to treatment." (*Id.* at 56). The Superintendent also denied the grievance and Plaintiff appealed to CORC. (*Id.*).

Plaintiff's transition plan, dated November 16, 2018, listed his SDP completion date as December 10, 2018. (Dkt. No. 72-11, at 2). Under a section labeled "Program Management Team Recommendations," the plan stated "PMT is in agreement that Inmate Williams has successfully satisfied his ART requirement by completing the Step-Down Program. . . . PMT recommends that Inmate Williams be placed in a facility that can meet his continued program needs." (*Id.* at 6).

On February 6, 2019, Plaintiff was transferred from Mid-State to Sullivan Correctional Facility, where he was released into General Population. (*See* Dkt. No. 71-1, ¶ 50; Dkt. No. 72-4; Dkt. No. 72-9, at 4; Dkt. No. 76-1, ¶ 50). He was ultimately released from DOCCS custody on February 23, 2021. (*See* Dkt. No. 72-4).

### B.    Defendants' Employment with DOCCS

From 2010 to 2012, Defendant O'Gorman was Director of the Crisis Intervention Program, a position on the Central Office Committee. (Dkt. No. 71-3, ¶ 10; *see* Dkt. No. 71-1, ¶ 24; Dkt. No. 76-1, ¶ 24). In September 2017, O'Gorman was promoted to Acting Deputy Commissioner for Correctional Facilities. (Dkt. No. 72-22, at 10; *see* Dkt. No. 71-1, ¶ 24, Dkt. No. 71-3, at ¶ 11; Dkt. No. 76-1, ¶ 24). In March 2018, O'Gorman became the Deputy Commissioner for Correctional Facilities and served in this position until he retired in December 2020. (Dkt. No. 72-22, at 10; *see* Dkt. No. 71-1, ¶ 25; Dkt. No. 71-3, ¶ 11; Dkt. No. 72-2, ¶ 17; Dkt. No. 75-1, ¶ 17; Dkt. No. 76-1, ¶ 25). While providing testimony, O'Gorman agreed that "from about September 2017 through [his] retirement [he] had final decisional authority for inmates in ad seg review receiving central office review and whether or not they remained in Ad Seg." (Dkt. No. 76-4, at 14–15).

Defendant Colvin was the Five Points Superintendent from May 2015 to his retirement in August 2018. (Dkt. No. 76-3, at 4; *see* Dkt. No. 71-1, ¶ 19, Dkt. No. 71-5, ¶ 11, Dkt. No. 76-1, ¶ 19). Defendant Thoms was the Mid-State Superintendent in 2016 and 2017. (Dkt. No. 71-4, ¶ 17; Dkt. No. 72-2, ¶ 18; *see* Dkt. No. 71-1, ¶ 14; Dkt. No. 75-1, ¶ 18; Dkt. No. 76-1, ¶ 14). Thoms left Mid-State in early 2018. (Dkt. No. 72-2, ¶ 18; *see* Dkt. No. 71-4, ¶ 18; Dkt. No. 75-1, ¶ 18).

## III.    STANDARD OF REVIEW

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

Where, as here, both parties have filed motions for summary judgment, "the court must evaluate each party's motion on its own merits." *Heublein, Inc. v. U.S.*, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)). The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden by showing that the nonmoving party has "'fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party has "failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

Defendants move for summary judgment on all of Plaintiff's remaining claims, (Dkt. No. 71), specifically addressing: (1) Plaintiff's Fourteenth Amendment procedural due process claims stemming from Plaintiff's confinement in Ad Seg; and (2) Plaintiff's Eighth Amendment conditions of confinement claims, (Dkt. No. 71-2). Plaintiff opposes Defendants' motion, (Dkt. No. 76), and moves for partial summary judgment as to Defendants O'Gorman and Thoms on his Fourteenth Amendment procedural due process claims arising from his confinement in SDP. (Dkt. No. 72).[11]

---

[11] Plaintiff argues that his confinement from December 1, 2017, to February 6, 2019, which Defendants classify as SDP, was in fact Ad Seg confinement. *See infra* Part IV.B.3.a.

### A.    Procedures for Administrative Segregation

Under DOCCS Directive 4933 (the "Directive"),[12] incarcerated individuals may be placed in SHU for multiple reasons, including for disciplinary purposes and for Ad Seg. (Dkt. No. 72-10, at 3–5; Dkt. No. 75-1, ¶ 1; *see* Dkt. No. 72-2, ¶ 1). Section 301.4(b) of the Directive states that "[a]dministrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility." (Dkt. No. 72-10, at 4; *see* Dkt. No. 72-2, ¶ 2; Dkt. No. 75-1, ¶ 2).

An inmate's status in Ad Seg is subject to periodic reviews. (Dkt. No. 72-10, at 4). Prior to July 2017, these reviews were required to be conducted every sixty days. (Dkt. No. 76-23, ¶ 16). After July 2017, an inmate confined to Ad Seg would have their "status reviewed every seven days for the first two months and at least every 30 days thereafter." (Dkt. No. 72-10, at 4). The procedure for reviewing the placement status of an inmate in Ad Seg is a two or three-step process, as follows:

First,

> A three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff shall examine the inmate's institutional record and prepare and submit to the Superintendent or designee a report setting forth the following: (i) Reasons why the inmate was initially determined to be appropriate for administrative segregation; (ii) Information on the inmate's subsequent behavior and attitude; and (iii) Any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

(*Id.*).

Second,

> Upon receipt of the report and any written statement received from the inmate, the Superintendent shall, except where the Superintendent or designee refers the

---

[12] Unless otherwise noted, the Court refers to the version of the Directive dated April 18, 2017, and updated July 27, 2018. (Dkt. No. 72-10).

> matter to central office . . . make a determination to retain the inmate in or release the inmate from administrative segregation.

(*Id.*).

Third,

> Where the Deputy Commissioner for Correctional Facilities has notified the Superintendent that an inmate in administrative segregation is to receive central office review, the Superintendent or designee shall as part of every review thereafter, refer the committee report, and any written statement received from the inmate, to a three-member central office committee consisting of a representative from the Office of Facility Operations, a member of the Department's Office of Special Investigations, and an attorney from the Office of Counsel. The central office committee shall then complete its review and forward the paperwork along with its recommendation to the Deputy Commissioner for Correctional Facilities. Upon receipt of the materials from the central office committee, including any written statement received from the inmate, the Deputy Commissioner shall make the determination to retain the inmate in or release the inmate from administrative segregation.

(*Id.*).

If the review results in a determination that the inmate is to remain in Ad Seg, the Directive requires that "the Superintendent or, as applicable, the Deputy Commissioner for Correctional Facilities, shall provide a notice to the inmate that states the reason(s) for the determination," along with the following specified statement:

> A determination has been made to continue your administrative segregation status for the reason(s) stated in this notice. Prior to your next review, you may write to the Superintendent or designee to make a statement regarding the need for continued administrative segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

(*Id.*).

## B. Fourteenth Amendment – Procedural Due Process

"To prevail" on a procedural due process claim, a plaintiff "must be able to demonstrate (1) that Defendants deprived him of a cognizable interest in 'life, liberty, or property,' (2) without affording him constitutionally sufficient process." *Proctor v. LeClaire*, 846 F.3d 597,

608 (2d Cir. 2017) (quoting U.S. Const. amend. XIV, § 1; *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). An inmate, whose liberty is already restricted by nature of his incarceration, has a liberty interest that is implicated under conditions that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995).

Unlike Disciplinary Segregation, Ad Seg is not to be used to punish inmates, but rather, "removes an inmate from the general population when he 'pose[s] a threat to the safety and security of the [prison] facility.'" *Proctor*, 846 F.3d at 609 (citation omitted). In *Hewitt v. Helms*, the Supreme Court found that an inmate had a protected liberty interest in avoiding Ad Seg status, that inmates therefore must receive due process in receiving the designation, and that "[p]rison officials must engage in some sort of periodic review" so that Ad Seg is not "used as a pretext for indefinite confinement of an inmate." 459 U.S. 460, 472, 476, 477 n.9. (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. 472; *see also Booker v. Griffin*, No. 16-cv-72, 2024 WL 756166, at *6, 2024 U.S. Dist. LEXIS 31314, at *18 (S.D.N.Y. Feb. 23, 2024) (describing the plaintiff's confinement in Ad Seg for six years as an example of an "atypical hardship").

Defendants argue that they are entitled to summary judgment dismissing Plaintiff's Ad Seg procedural due process claims on the grounds that: (1) Plaintiff failed to exhaust his administrative remedies; (2) to the extent Plaintiff's claims are based on allegedly deficient Ad Seg reviews prior to November 16, 2017, they are barred by the statute of limitations; (3) Defendants lack personal involvement; and (4) Plaintiff received constitutionally sufficient reviews of his Ad Seg placement. (Dkt. No. 71-2, at 6–20). Plaintiff does not oppose Defendants' motion insofar as it seeks dismissal of his procedural due process claims: (1) against Defendant

Colvin, (Dkt. No. 76, at 7 n.1, 27), (2) against Defendant Thoms for the time period prior to

December 1, 2017, (*id.*), and (3) against Defendant O'Gorman arising from the Ad Seg reviews

Plaintiff received, excluding the final review. Plaintiff otherwise opposes Defendants' motion.

(*See id.* at 27–29).

Additionally, Plaintiff moves for summary judgment on his procedural due process

claims against Defendants O'Gorman and Thoms for the time period when Plaintiff was in SDP.

(Dkt. No. 72). Defendants contest Plaintiff's entitlement to Ad Seg reviews during this period of

time and argue that Thoms lacked authority to perform any such review. (Dkt. No. 75).

### 1.    Administrative Exhaustion

Defendants argue that, with the exception of the Ad Seg reviews he received from

October 16, 2016, through May 7, 2017,[13] Plaintiff failed to file grievances and "properly appeal

through all three levels of the" Inmate Grievance Program. (Dkt. No. 71-2, at 10–11). In his

supplemental brief, Plaintiff asserts that Ad Seg reviews are non-grievable, and that Defendants

have not met their burden to show Plaintiff failed to exhaust his claims. (Dkt. No. 95, at 1–4).[14]

The Prison Litigation Reform Act requires that inmates exhaust any administrative

remedies available prior to filing an action "with respect to prison conditions" under 42 U.S.C. §

1983. 42 U.S.C. § 1997e(a). New York State regulations provide for a three-step administrative

review of prisoner grievances, which is initiated with a complaint to the Grievance Clerk. *See,

e.g.*, *Campos v. Corr. Officer Smith*, 418 F. Supp. 2d 277, 278 (W.D.N.Y. 2006). Defendants

---

[13] Defendants' memorandum appears to contain a typographical error, twice referring to the date as "May 7, *2016*," but ultimately only seeking the dismissal of "due process claims before October 16, 2016 and after May 7, 2017" for failure to exhaust. (*See* Dkt. No. 71-2, at 10–11).

[14] Plaintiff originally argued that "an inmate [in Ad Seg] exhausts his administrative remedies by appealing his Ad Seg denials, not by grieving them," but changed his position after the Court requested additional analysis of the issue. (Dkt. No. 76, at 29; *see also* Dkt. No. 94; Dkt. No. 95, at 1–4).

maintain that Plaintiff was required to grieve his adverse Ad Seg determinations through the typical process. (Dkt. No. 71-2, at 10–11; Dkt. No. 99, at 1).

Plaintiff makes several arguments in response. First, Plaintiff notes that administrative exhaustion is an affirmative defense, and therefore it is Defendants' burden to prove that his claims were not exhausted by "pointing to legally sufficient sources such as statutes, regulations, or grievance procedures," and "establish[ing] that a 'process exists and applies to the underlying dispute.'" (Dkt. No. 95, at 2 (quoting *Vega v. Broome County*, No. 21-cv-788, 2023 WL 6318919, at *17, 2023 U.S. Dist. LEXIS 173628, at *48 (N.D.N.Y. Sept. 28, 2023)). Plaintiff then contends that Defendants have not cited to testimony, case law or a DOCCS directive that indicates Ad Seg determinations are grieved through the standard inmate grievance process. (*Id.*).

Second, Plaintiff points to DOCCS Directive 4040 § 701.3(e)(1), (available at https://doccs.ny.gov/system/files/documents/2022/12/4040.pdf), which states "[a]n individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism *which extends review to outside the facility* shall be considered non-grievable." (Dkt. No. 95, at 2); *see also* 7 N.Y.C.R.R. § 701.3(e)(1) (emphasis added). As the Ad Seg review process involves two levels of review outside the facility (the Central Office Committee and the Deputy Commissioner), these decisions would fall into this category. (Dkt. No. 95, at 2 (citing Dkt. No. 72-10, at 4)).

Third, Plaintiff explains that DOCCS Directive 4933, "delineates specifically who is involved in this review process and the sequence in which they are involved,"; and that requiring Plaintiff to have filed "a grievance after every periodic Ad Seg denial is nonsensical and [in] conflict[] with Directive [] 4933 because this would subject the Deputy Commissioner's

decision, which is supposed to be final under Directive [] 4933, to additional review under the Incarcerated Grievance Program," itself consisting of three levels of review. (*Id.* at 2–3).

Fourth, Plaintiffs argues that "grieving Ad Seg reviews is in direct discord with the very purpose of the PLRA's exhaustion requirement." (*Id.* at 3). Plaintiff cites to *Flanagan v. Maly*, No. 99-cv-12336, 2002 WL 122921 at *2, 2002 U.S. Dist. LEXIS 1373, at *6–7 (S.D.N.Y. Jan. 29, 2002), a case that addressed whether an inmate plaintiff was required file a grievance in order to exhaust a due process claim relating to his placement in SHU. *Flanagan* held that the plaintiff was not required to file a grievance after "presenting his objections in the administrative appeals process" because "[o]nce the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless." *Id.*, 2002 WL 122921, at *2, 2002 U.S. Dist. LEXIS 1373, at *7. As Plaintiff explains, the same logic applies here, because "given the multiple levels of the Ad Seg review process, culminating in review by the Deputy Commissioner, resort to additional internal grievance mechanisms in the context of Ad Seg reviews would be pointless" and "[f]urthermore, the state is given the opportunity to review and correct any mistakes in periodic Ad seg reviews." (Dkt. No. 95, at 3).

The Court notes that Defendants did not cite any caselaw indicating that Ag Seg determinations are subject to the standard inmate grievance program in their original briefing,[15] and Defendants also did not address the new arguments Plaintiff made in his supplemental briefing. Instead, in their supplemental letter brief, Defendants contend that Plaintiff submitted a grievance, demonstrating that it was possible to use the grievance procedures to challenge his Ad

---

[15] The case on which Defendants relied did not involve a challenge to confinement in Ad Seg. *See Dublino v. Schenk*, No. 19-cv-381, 2020 WL 263664 at *1–3, 2020 U.S. Dist. LEXIS 8214, at *1–8, (N.D.N.Y. Jan. 17, 2020), *report and recommendation adopted* 2020 WL 1526908, 2020 U.S. Dist. LEXIS 55737 (N.D.N.Y. Mar. 31, 2020) (involving claims "relate[d] to the free flow of mail and alleged retaliation regarding attorney visits").

Seg determinations. (Dkt. No. 99, at 1).[16] But absent any discussion of Plaintiff's arguments, including how a requirement of grieving Ad Seg determinations is consistent with DOCCS Directive 4040, 7 N.Y.C.R.R. § 701.3(e)(1), and absent any evidence on the issue, the Court cannot find that Defendants have met their burden of establishing that the standard grievance process applies to Ad Seg determinations. *See Vega*, 2023 WL 6318919, at *17, 2023 U.S. Dist. LEXIS 173628, at *48. Defendants' motion for summary judgment on the grounds that Plaintiff Plaintiff failed to administratively exhaust his procedural due process claims is therefore denied.

### 2.    Statute of Limitations

Defendants argue that Plaintiff's Fourteenth Amendment claims prior to November 16, 2017, three years prior to the date Plaintiff filed this action, are time-barred. (Dkt. No. 71-2, at 7–10). At oral argument Plaintiff conceded that only the November 2017 review is timely.[17] In New York, the statute of limitations for a Section 1983 action is three years. *Barnes v. City of New York*, 68 F.4th 123, 127 (2d Cir. 2023). An incarcerated individual's claims are tolled for statute of limitations purposes while exhausting administrative remedies in accordance with PLRA requirements. *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011). However, absent any grievance process, no claim is subject to tolling. (*See* Dkt. No. 99, at 3 (arguing that "[i]f the Court holds that Plaintiff need not have grieved his claims . . . it follows that Plaintiff is not entitled to any sort of tolling of the three-year statute of limitations while his grievances were pending.")). Thus, as Plaintiff agreed at oral argument, only the final November 14, 2017 review

---

[16] Defendants also argue that Plaintiff would have been required to grieve conditions subject to an Eighth Amendment claim, (*see* Dkt. No. 99, at 2–3), which is not at issue in the Fourteenth Amendment Ad Seg context here.

[17] Plaintiff initially contended that Plaintiff's last four reviews were not time-barred. (*See* Dkt. No. 76, at 27–28). However, that argument appeared to rely on Plaintiff's original position on administrative exhaustion and tolling, namely, that he exhausted administrative remedies through his follow-up statements to each adverse Ad Seg determination, and that his claims were tolled while exhausting those remedies. (*See id.*). In his supplemental briefing, Plaintiff argues that the Ad Seg Reviews are not grievable. *See supra* Part IV.B.1.

is timely. Therefore, the Court grants Defendants summary judgment on this issue and dismisses all Fourteenth Amendment claims arising from the Ad Seg reviews Plaintiff received prior to the November 2017 review.

### 3.    Remaining Procedural Due Process Claims

Plaintiff is left with two remaining theories regarding his procedural due process claims. The first is based on the failure of Defendants O'Gorman and Thoms to provide Plaintiff with Ad Seg reviews while in SDP and the second is specific to O'Gorman and is based on the final Ad Seg review Plaintiff received, releasing Plaintiff from Ad Seg.

### a.    Ad Seg Reviews in SDP

Plaintiff argues that while incarcerated in SDP at Mid-State, he was actually in Ad Seg, and therefore it was a due process violation to fail to provide Plaintiff with Ad Seg reviews. (Dkt. No. 72-1, at 10–14). Defendants, in addition to arguing that Defendant Thoms lacked the authority to provide Ad Seg reviews to Plaintiff, (Dkt. No. 75, at 6), claim that SDP and Ad Seg were different, and thus Plaintiff was not entitled to Ad Seg reviews while in SDP, (*id.* at 5–6).

The record reflects that DOCCS transferred Plaintiff to what it classifies as the Step-Down to General Population Program. There is no dispute that Defendant O'Gorman determined that Plaintiff was to be released from Ad Seg, (*see* Dkt. No. 71-3, at 77), and that Plaintiff then was transferred into SDP, (*see, e.g.*, Dkt. No. 71-1, ¶ 46; Dkt. No. 72-2, ¶ 16; Dkt. No. 75-1, ¶ 16; Dkt. No. 76-1, ¶ 46). Numerous official documents from DOCCS reflect that Plaintiff entered the SDP. For example, Plaintiff signed a form titled "Standards for the Step-Down to General Population Program," providing the expectations for the program. (Dkt. No. 76-7, at 2). Plaintiff's progress throughout the program was tracked, (Dkt. No. 71-7, at 6–10), and his behavior was commented upon by both group discussion leaders, (*id.* at 12–53), and his PMT, (Dkt. No. 72-17, at 2–54).

The September 2017 revised version of the "Step-Down Program Inmate Orientation Manual" for Mid-State indicates inmates participated in group programming, in the form of "two-hour module[s] of programming four days a week." (Dkt. No. 72-12, at 4). In the evenings, inmates had access to "[p]rogram classrooms . . . for congregate leisure activities" and two hours of recreation a day. (*Id.*). PMTs "comprised of Security and Program staff" would meet with inmates out of their cells "to discuss progress and benchmarks, and to make any adjustments in the participant's program plan." (*Id.*).  Inmates, including Plaintiff, also received various incentives to complete the program and its individual phases. (*See id.* at 4, 9–10; Dkt. No. 71-7, at 55–63). Plaintiff passed through the various stages of the program and, upon his completion, was eventually released. (*See* Dkt. No. 71-7, at 6–10; Dkt. No. 72-9, at 4).

Plaintiff claims that "[t]he uncontroverted evidence establishes that [he] was . . . on Ad seg status, for the period between December 1, 2017 to February 6, 2019," but only points to handwritten notes on forms[18] and a misreading of Defendant Thoms' testimony[19] to support the argument that Plaintiff was actually in Ad Seg. (*See* Dkt. No. 72-1, at 12). Plaintiff also cites to the fact that while in SDP Plaintiff was confined in the SHU and removed from the General

---

[18] Plaintiff cites to handwritten notations on the following documents, (Dkt. No. 72-1, at 12): (1) Plaintiff's SHU "Initial Interview" form which contains a handwritten note "Admin. Seg." next to a question mark in the space for total keeplock/SHU (Dkt. No. 72-14, at 2; Dkt. No. 72-2, ¶ 20; *see* Dkt. No. 75-1, ¶ 20); (2) A card "placed outside Plaintiff's cell while in [SDP]" contains a handwritten note stating "Ad/Seg No Bunkie." (Dkt. No. 72-2, ¶ 19; Dkt. No. 72-13, at 2; *see* Dkt. No. 75-1, ¶ 19); (3) A form labeled "Mid-State SDP Discretionary Time Cut Review," leaves blank spaces for "Current SHU Release Date" and "Current KL Release Date," along with a handwritten note stating "Admin Seg." (Dkt. No. 72-5, at 2). The form also leaves spaces to recommend time cuts for SHU and KL in which place are handwritten notes stating "n/a" and "n/a admin seg," respectively. (*Id.*). Defendants have responded that some of the notes on these documents referred to Plaintiff's previous status, rather than indications of his then current status. (Dkt. No. 75, at 5–6; *see also* Dkt. No. 75-1, ¶¶ 19–20).

[19] Plaintiff cites to Thoms testimony "that there was 'no time to cut' because Plaintiff was in Ad Seg at the time." (Dkt. No. 72-1, at 12; *see also* Dkt. No. 72-2, ¶ 21). But Defendant Thoms stated that inmates in Ad Seg cannot get time cuts if they do not have any "disciplinary SHU time," and did not address Plaintiff's status. (Dkt. No. 72-19, at 18–19; Dkt. No. 75-1, ¶ 21).

Population.[20] (*See* Dkt. No. 72-2, ¶ 11; Dkt. No. 75-1, ¶ 11). But Plaintiff, except (for the first time) in his Reply Brief, (*see* Dkt. No. 81, at 6–8), confines his argument to the point that SDP *was* Ad Seg and that he was entitled to *Ad Seg* reviews, rather than that Plaintiff was entitled to periodic reviews more generally.[21]

Moreover, Plaintiff has failed to provide any evidence or authority for the proposition that O'Gorman or Thoms had any power to perform *Ad Seg reviews* of Plaintiff while he was in SDP. [22] "To 'establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation.'" *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). "To sustain a 42 U.S.C. § 1983 action, there must be some showing of personal responsibility for the alleged constitutional deprivation." *Brody v. McMahon*, 684 F. Supp. 354, 356 (N.D.N.Y.) (citing *Duchesne v. Sugarman*, 566 F.2d 817, 830 (2d Cir. 1977)), *aff'd*, 862 F.2d 304 (2d Cir. 1988); *see, e.g.*, *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 317 (S.D.N.Y. 2008) ("Finkle, as Executive Director of the CCRB, did not have the authority to take action with respect to any constitutional violation plaintiffs may have

---

[20] Plaintiff's cell in SDP did not differ from the cell he had occupied in Ad Seg and he continued to lack a cellmate. (*See* Dkt. No. 72-19, at 17, 24–25; Dkt. No. 76-6, at 27, 29).

[21] In his reply brief Plaintiff argues, for the first time, that "regardless of what DOCCS denominated Plaintiff's confinement he was in SHU and he was entitled to periodic review. (Dkt. No. 81, at 6). The Court does not address this argument, made for the first time in Plaintiff's reply brief. The parties have not addressed whether Plaintiff's confinement in SDP implicated a protected liberty interest entitling him to due process. *See Jusino v. Rinaldi*, No. 18-cv-2004, 2024 WL 308512, at *14–17, 2024 U.S. Dist. LEXIS 14078, at *44–54 (D. Conn. Jan. 26, 2024) (applying *Proctor* standards to reviews the plaintiff received while in Special Needs Management Status, which the record suggested was comparable to Ad Seg for part of plaintiff's placement there); *Thorpe v. Clarke*, 37 F.4th 926, 941–43 (4th Cir. 2022) (finding as part of a qualified immunity analysis that the plaintiffs' confinement in a step-down program run by the Virginia Department of Corrections impeded a constitutionally protected liberty interest).

[22] Plaintiff does not directly challenge Defendant's argument that, in any event Defendant Thoms was not involved in the Ad Seq review process. Plaintiff argues that Thoms had the power to recommend whether an inmate remained in SDP, (Dkt. No. 81, at 9–10), citing to Thoms' testimony that he would make recommendations to the Central Office regarding whether to release inmates from SDP and that the Central Office's actions "would be based on [his] recommendation." (*Id.* (quoting Dkt. No. 76-11, at 24–26)). However, this is a separate question from whether Defendant Thoms had the authority to provide Plaintiff with Ad Seg reviews, as Plaintiff contends was required.

suffered from their confrontation with Officers Melendez and Jaikissoon. It necessarily follows that the allegations are insufficient to plead the personal involvement of Finkle in any alleged constitutional violation against plaintiffs."); *Brody*, 684 F. Supp. at 356 (holding that the defendants could not be liable for conditions at prison in a Section 1983 action because they had "no hiring, firing, or disciplinary power over any supervisory staff or personnel of the correctional facilities" and "no direct power to control or direct the customs and policies of the facilities").[23] Plaintiff's motion for summary judgment based on the failure to provide Ad Seg reviews in SDP therefore must be dismissed.

### b.     The Final November 14, 2017 Ad Seg Review

In Plaintiff's last Ad Seg review on November 14, 2017, Defendant O'Gorman concurred with the Central Office's recommendation that Plaintiff should be released from Ad Seg. (*See* Dkt. No. 71-3, at 77). Plaintiff has failed to raise a material issue of fact from which a jury could find that this review, which recommended *release* from Ad Seg, deprived him of a cognizable liberty interest or failed to afford him constitutionally sufficient process. *Cf. Proctor*, 846 F.3d at 610 (holding that the defendant had a substantial interest "in avoiding an indefinite Ad Seg term" and that he was entitled to "meaningful periodic reviews of Ad Seg"). Accordingly, Plaintiff's procedural due process claim based on the November 14, 2017 Ad Seg review must be dismissed.

---

[23] At oral argument Plaintiff cited to the "Step-Down Program Inmate Orientation Manual," which states "[a]ll rules that govern your time in Bldg. 125 are developed from Directive #4933, or additional department approved variances." (Dkt. No. 72-12, at 3). This statement however, only suggests that the Directive, which contains procedures relating to SHU *in general*, is relevant to Building 125, which is a SHU building, and cannot reasonably be read to mean that Ad Seg reviews are to be provided to inmates in SDP.

### C.        Eight Amendment – Conditions of Confinement

The Eighth Amendment, in its prohibition against the infliction of "cruel and unusual punishments," requires that prison officials "provide humane conditions of confinement," including "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care," and "tak[ing] reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). "A plaintiff asserting an Eighth Amendment claim related to the conditions of his confinement must satisfy both objective and subjective tests: (1) to satisfy the objective test, 'a plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs' such that the conditions 'pose an unreasonable risk of serious damage to his health'; and (2) to satisfy the subjective test, 'a plaintiff must demonstrate that the defendants imposed the conditions with deliberate indifference,' meaning that the defendants knew of, and disregarded, 'an excessive risk to the plaintiff's health or safety.'" *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 377 (N.D.N.Y. 2020) (quoting *Rasheen v. Adner*, 356 F. Supp. 3d 222, 240 (N.D.N.Y. 2019)); *see also Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020).

Plaintiff asserts two theories regarding violations of the Eighth Amendment. First, Plaintiff claims that Defendants deprived Plaintiff of "basic human needs" due to his conditions of confinement. (*See* Dkt. No. 24, at 27–29; Dkt. No. 76, at 13–14). Second, Plaintiff argues that the specific length of time he was subjected to solitary confinement was unconstitutional because at some point there was no legitimate penological justification for keeping him confined in such conditions. (*See* Dkt. No. 24, at 29; Dkt. No. 76, at 17–26); *see also H'Shaka*, 444 F. Supp. at 378–80 ("As to the subjective element, the Supreme Court has noted that conditions satisfying the Eighth Amendment standard include 'those that are totally without penological justification.'" (quoting *Hope v. Peltzer*, 536 U.S. 730, 737 (2002))).

Defendants move for summary judgment on Plaintiff's Eighth Amendment claims. (*See* Dkt. No. 71). In their briefing, Defendants did not address the objective conditions of Plaintiff's confinement and whether they meet the standard to qualify as a violation of the Eighth Amendment. (*See* Dkt. No. 71-2, at 20–23). Defendants do argue that Defendant Colvin lacked personal involvement and culpable intent, and that prior to 2015, Defendant Thoms lacked personal involvement and culpable intent. (*Id.* at 21–22). Additionally, Defendants briefly argue that Plaintiff's Ad Seg confinement was justified because Defendant O'Gorman conducted a "holistic review," "entirely consistent with DOCCS Directive #4933."  (*See id*. at 22–23).

### 1.   Defendants Colvin and Thoms' Personal Involvement

The parties agree that Defendant Colvin lacked personal involvement for the period prior to 2015, (prior to when Plaintiff arrived at Five Points), and Defendants do not contest Colvin's personal involvement or culpable intent in Plaintiff's conditions of confinement from 2015 to when Plaintiff was moved to Mid-State. (*See* Dkt. No. 71-2, at 22; Dkt. No. 76, at 14–15). Defendants claim Defendant Thoms lacked personal involvement in Plaintiff's Ad Seg confinement under the assumption that Plaintiff's claim does not include the time in which he was in SDP at Mid-State, where for part of the time Thoms was Superintendent. (*See* Dkt. No. 71-2, at 21). However, Plaintiff's Amended Complaint is clear that Plaintiff's conditions of confinement claims against Defendants are based on the entire "nine years" Plaintiff was in "continuous solitary confinement," which he defines to include his time in SDP. (*See* Dkt. No. 24, at 2, n.1, 27).

Accordingly, Defendants' motion seeking summary judgment dismissing (1) any Eighth Amendment claims against Colvin prior to Plaintiff's incarceration at Five Points in 2015, and (2) any Eight Amendment claims against Thoms prior to Plaintiff's incarceration at Mid-State in 2017, is granted.

## 2.   Legitimate Penological Justification

Defendants also argue that Plaintiff's continued confinement in Ad Seg was justified as Defendant O'Gorman considered a multitude of factors, not just Plaintiff's past behavior, and in a manner consistent with the Directive. (Dkt. No. 71-2, at 22–23). Plaintiff argues that there is a genuine dispute of material fact over why Plaintiff was kept in Ad Seg, and whether it was impermissibly "based on his past conduct." (Dkt. No. 76, at 17–26).

As previously described, the subjective element of an Eighth Amendment claim, i.e., that the defendant acted with deliberate indifference, is satisfied if there is no penological justification for the condition imposed. *H'Shaka*, 444 F. Supp. 3d at 380. Whether an appropriate penological justification for Plaintiff's confinement in Ad Seg existed is "intertwined" with the same questions at the heart of Plaintiff's Fourteenth Amendment procedural due process claims. *See Smith v. Annucci*, No. 18-cv-6261, 2019 WL 539935, at *7, 2019 U.S. Dist. LEXIS 21888, at *20 (W.D.N.Y. Feb. 11, 2019) ("[I]f Defendants have failed to provide any meaningful review of Plaintiff's status for more than 20 years but have instead held him in administrative segregation for solely punitive reasons, his right to due process and his right to be free from cruel and unusual punishment are both implicated."). Accordingly, if "there is a genuine dispute of material fact regarding whether the [Defendant was] relying solely on Plaintiff's past conduct . . . when deciding to retain him in Ad Seg," then "there is also a genuine dispute of material fact as to whether the [Defendant] had a legitimate penological justification for retaining Plaintiff in Ad Seg for the purposes of the Eighth Amendment." *H'Shaka*, 444 F. Supp. 3d at 380 (citation omitted).

Defendants claim that the Ad Seg reviews Plaintiff received were "constitutionally meaningful" and make the following three points in support of that contention. (Dkt. No. 71-2, at 17–20). First, "referenc[ing] Plaintiff's conviction history and the reasons for his initial Ad Seg

placement" was not just "permitted" but "compelled" under the Directive. (*Id.* at 17–18). Second, "Defendants duly considered many other factors," such as "behavior and attitude," and "[a]t no point . . . did O'Gorman rely *exclusively* on past factors." (*Id.* at 18–19). Third, while "Plaintiff was not owed 'meaningful notice' of his release conditions," he was provided with "tangible goalposts." (*Id.* at 19–20). In response, Plaintiff argues that there are "genuine issues of material fact" that exist regarding whether new evidence was considered, whether the appropriate guiding principles governed, and whether the appropriate procedures were followed. (Dkt. No. 76, at 18–26; *see id.* at 27). Plaintiff argues that "[e]ven though his behavior was largely positive and he was frequently encouraged to continue his good behavior, [he] did not receive a recommendation to be released from Ad Seg until seven years into his sentence." (*Id.* at 11).

The Second Circuit has held that for Ad Seg reviews to be constitutionally "meaningful," three criteria must be met:

> First, the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified. . . . Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available. . . . Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term.

*Proctor*, 846 F.3d at 610–11.

Here, Plaintiff has presented evidence, that would allow a reasonable factfinder to conclude that Defendant O'Gorman's reviews did not meet the necessary criteria. There are facts from which a jury may find that Defendant O'Gorman did not consider relevant evidence as it became available to him. Although Plaintiff had not received a misbehavior report since January 2015, (Dkt. No. 71-3, at 79), he was continued in Ad Seg up until November 30,

2017, more than two years after he finished serving his disciplinary sanction for the offense, (*see id.* at 66 (stating Plaintiff "completed 180 days in SHU for the offense" on July 3, 2015)).

As Plaintiff notes, while Defendants state that new events were considered "to some degree," a jury may find that unchanging rationales across various reviews throughout Plaintiff's Ad Seg confinement indicate that this was not truly the case. (Dkt. No. 76, at 19 (citing Dkt. No. 71-2, at 18)). For example, Defendant O'Gorman signed off on Plaintiff's March 15, 2017 review, containing a report from the Central Office Committee stating that "[b]ased upon [Plaintiff's] criminal history, his prior release from SHU for the weapons infraction and his general malcontent demeanor the committee believes that Williams should remain in Administrative Segregation." (*See* Dkt. No. 71-3, at 64, 66). Nearly identical reasoning appeared in three other Central Office Committee reports, dating back to Plaintiff's November 2015 review, (*see id.*, at 51, 54, 60), suggesting that new evidence may not have truly been considered over that period.

When asked about whether there was a specific length of positive behavior that an inmate needed to demonstrate in order to be removed from Ad Seg, O'Gorman stated:

> [I]f an inmate's doing life without parole, five to ten years is a drop in the bucket to those individuals. So I can't say that, you know, if he's good for three years or good for two years or good for one year or good for ten years. It depends on the totality of the situation. That's just the way it is.

(Dkt. No. 76–4, at 17). Such a statement suggests that O'Gorman may not have considered evidence of an inmate's good behavior as it became available.

A jury may also find that "institutional safety and security" were not always the "guiding principles" used to evaluate Plaintiff's confinement in Ad Seg. *See Proctor*, 846 F.3d at 611. Defendant O'Gorman signed off on a July 2017 review keeping Plaintiff in Ad Seg when the Central Office Committee's report stated, "[a]s has been noted in the past, [Plaintiff] tends to

communicate via litigation and/or file grievances." (Dkt. No. 71-3, at 70). As Plaintiff argues, "[a] reasonable jury could conclude that [he] was kept in Ad Seg not for any legitimate safety or security reason, but as improper retaliation over the Ad Seg review committees' [sic] distaste for his legitimate use of the grievance and legal systems." (Dkt. No. 76, at 24); *see also* Proctor, 846 F.3d at 613 ("The review paperwork also contains inexplicable logic that raises red flags about whether the underlying reviews were conducted genuinely.").

Finally, Plaintiff argues that the reviews he received "frequently contained identical language," and the use of boilerplate language is a factor that the jury may consider in determining whether the reviews were constitutionally meaningful. (Dkt. No. 76, at 10). For example, the previously mentioned July 2017 review Defendant O'Gorman signed contained a report from the Central Office Committee that differed in one sentence from the Committee report issued a month before. (*See* Dkt. No. 71-3, at 70; Dkt. No. 76-16, at 4); *cf. Proctor*, 846 F.3d at 613 ("The years of virtually identical reports may suggest to a reasonable jury that Proctor's reviewers treated the process as satisfied by boilerplate explanations instead of a forthright review"). Additionally, there is evidence from which a jury might find that O'Gorman acted as a "rubber stamp" for the decisions of the Central Office Committee. *Id*. For example, in Plaintiff's final review, the Central Office Committee recommended "that it may be appropriate to consider inmate Williams for a transition to Step-Down program." (Dkt. No. 71-3, at 79). Despite the lack of indication in that Central Office Committee review that there had been any meaningful change in Plaintiff's circumstances, (*see id.*), and despite the three-person facility committee's statement that "[t]he presence of Williams in general confinement of any correctional facility is an extreme risk," (*id.* at 78), O'Gorman stated that he had reviewed the Central Office Committee's report and "concur[ed] with the Committee's recommendation

regarding inmate William's release" from Ad Seg, (*id.* at 77).[24] Given all of the circumstances here, a jury may infer that O'Gorman was not himself considering the relevant factors and instead was merely signing off on whatever the Central Office Committee recommended.

The Court adds that, as in *Proctor*, "[i]t is important to recognize that not all of the evidence points in favor of" Plaintiff. 846 F.3d at 614. However, "[t]hat [Plaintiff] has produced evidence to raise a fair question about the procedural sufficiency of his reviews is all that is required today." *Id.* The Court finds that a triable issue of fact exists with respect to whether Plaintiff was provided with constitutionally meaningful Ad Seg reviews, and thus whether a sufficient penological justification existed for Plaintiff's conditions of confinement.

Accordingly, Defendant's motion for summary judgment on Plaintiff's Eighth Amendment claims is, except for with respect to Defendants Colvin and Thoms for the periods previously stated, denied.

## V.    PLAINTIFF'S MOTION TO STRIKE

Plaintiff moves to strike portions of Defendants' affidavits as inadmissible, citing Rule 56(c)(4) of the Federal Rules of Civil Procedure and Local Rule 7.1(b)(2). (Dkt. Nos. 77, 77-1). Rule 56(c)(4) states: "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Local Rule 7.1(b)(2) states that "[a]n affidavit must not contain legal arguments." Plaintiff objects that certain statements in Defendants' affidavits do not adhere to these rules because they variously call for speculation,

---

[24] In contrast with the Central Office Committee and Deputy Commissioner of Correctional Facilities' recommendations from the same period, the three-member facility committee stated in Plaintiff's final review that "[t]he presence of Williams in general confinement of any correctional facility is an extreme risk to staff, inmates, the general public, and [sic] as well as the safety, security, and the good order of the facility." (Dkt. No. 71-3, at 78).

lack foundation, violate the best evidence rule, or call for a legal conclusion. (Dkt. No. 77-1, at 2–4).

"In 2010, subdivision (c) was added to Rule 56," which "provides that, on a motion for summary judgment, '[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Hooks v. Forman Holt Eliades & Ravin LLC*, No. 11-cv-2767, 2015 WL 5333513, at *3, 2015 U.S. Dist. LEXIS 122418, at *8 (S.D.N.Y. Sept. 14, 2015) (quoting Fed. R. Civ. P. 56(c)). An advisory note to the Rule states that its addition makes a motion to strike unnecessary. *Id.*, 2015 WL 5333513, at *3, 2015 U.S. Dist. LEXIS 122418, at *8–9 (citing Fed. R. Civ. Pro. 56, advisory committee's note ("[T]here is no need to make a separate motion to strike.")). As a result, a district court is free to "take into consideration the admissibility of evidence in the normal course of resolving such a motion." *See id.* (citations omitted); *see also Nodoushani v. S. Conn. State Univ.*, 507 F. App'x 79, 80 (2d Cir. 2013) (summary order) ("District courts have leeway on motions to strike in the context of summary judgment motions.").

However, without ruling on Plaintiff's specific objections, the Court notes that in considering the parties' motions for summary judgment, it did not rely on the portions of the affidavits Plaintiff seeks to strike. Consequently, Plaintiff's motion is denied as moot. *See, e.g.*, *Fubon Ins. Co. v. OHL Int'l.*, No. 12-cv-5035, 2014 WL 1383604, at *11, 2014 U.S. Dist. LEXIS 49893, at *32–33 (S.D.N.Y. Mar. 31, 2014); *Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 293 (E.D.N.Y. 2013).

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 71) is **GRANTED in part**; and it is further;

**ORDERED** that Plaintiff's procedural due process claims based upon the Ad Seg reviews are **DISMISSED**; and it is further;

**ORDERED** that any Eighth Amendment claims a) against Defendant Colvin except for the period between July 6, 2015 to December 1, 2017 and b) against Defendant Thoms except for the period between December 1, 2017 and when Thoms left Mid-State are **DISMISSED**; and it is further;

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 71) is otherwise **DENIED**; and it is further;

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 72) is **DENIED**; and it is further;

**ORDERED** that Plaintiff's Motion to Strike (Dkt. No. 77) is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated: <u>May 16, 2024</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge